## THE NORTH STAR.

### NORTHERN STEAMSHIP CO. v. BROWN et al.

(Circuit Court of Appeals, Sixth Circuit. May 8, 1894.)

No. 105.

1. COLLISION—APPLICATION OF RULES.

As Act March 3, 1885, by which the revised international rules for preventing collisions at sea were adopted for the navigation of United States vessels on the high seas and coast waters, expressly excepted navigation on "harbors, lakes, and inland waters," Rev. St. § 4233, continued in force as to navigation on the Great Lakes.

2. SAME—STEAMERS MEETING IN FOG.

Under Rev. St. § 4233, rule 21, requiring every steam vessel approaching another so as to involve risk of collision to slacken speed, or, if necessary, stop and reverse, and, when in a fog, to go at a moderate speed, a steam vessel, in a fog, approaching another, whose whistle bears a few points off either bow, should stop, and, if necessary, reverse, until the exact position and course of the other vessel can be ascertained, unless such circumstances present themselves at the time as would lead a reasonably prudent and skillful navigator to the confident belief that no risk of collision exists.

3. SAME—CONFUSION OF SIGNALS.

Two steamers, the N. and the S., approaching each other on nearly opposite courses in a fog, when a mile or less apart, exchanged repeated double-blast signals; but the S., mistaking some of the signals of the N. for single blasts, without stopping to ascertain the N.'s exact position and course, herself gave a single blast, ported, and, running across the bows of the N., was sunk by collision with her. Held, that the S. was guilty of reckless navigation and gross negligence. 43 Fed. 807, affirmed.

4. SAME—FAILING TO STOP AND REVERSE—RATE OF SPEED.

The whistle of the S., as first heard from the N., bore but a point on the starboard bow, and was placed by the master of the N. only half a mile away, and there was no widening of the bearing of the S.'s subsequent whistles. Held, that the N. was also in fault, in failing to stop and reverse, especially after the cross signal of the S., and in keeping up a speed of eight to ten miles an hour, at which she could not have stopped in the distance at which, in the fog, she could have seen an approaching vessel, while she could steer at four miles an hour or less. 43 Fed. 807, affirmed.

5. SAME—EVIDENCE.

The rules that the burden on the manifest wrongdoer is greater than merely to show by a preponderance of evidence that the other vessel was guilty of fault, and that a slight fault is no ground for dividing damages, do not apply where the faults of such other vessel are shown by the allegations and proofs on her part, and where, but for her faults, the collision would have been avoided.

**6. SAME—APPEAL—INTEREST ON DAMAGES.**

The appellate court, when differing from the conclusions of the court below as to the grounds on which that court allowed interest on the damages awarded for collision, may modify the decree by excluding such interest. 44 Fed. 492, affirmed.

Appeal from the Circuit Court of the United States for the Eastern District of Michigan.

Libel by Harvey H. Brown and others against the steamer North Star (the Northern Steamship Company, claimant) for a collision between said steamer and the steamer Sheffield. The district court found both vessels in fault, and decreed that the damages should be divided (43 Fed. 807); and, after a hearing of exceptions to the report of the commissioner on the question of damages (44 Fed. 492), a decree was entered for libelants. Claimant appealed.

This was an appeal from a decree of the circuit court of the eastern district of Michigan affirming the decree of the district court, which held that two steamers, the Charles J. Sheffield and the North Star, were both at fault in a collision between them on Lake Superior, and divided the damages.

Harvey H. Brown, E. M. Peck, Fayette Brown, and C. J. Sheffield, the owners of the Sheffield, which was sunk by the collision, began the litigation by filing their libel in the district court against the North Star. The libel alleged that on the 14th day of June, A. D. 1889, the Sheffield was bound on a voyage from South Chicago, Ill., to Two Harbors, Minn., with no cargo; that having passed Whitefish Point, on Lake Superior, and adopted a course W. N. W., she encountered foggy weather, with a strong southerly breeze; that it was not a steady fog, but would light up at intervals, affording a view for several miles ahead; that, to overcome the effects of the southerly wind, she was kept up a quarter of a point from about 1 to about 4 o'clock p. m. on that day, when the wind shifted ahead, moderating to a light breeze, the fog gradually setting in denser, and more steady; that from the time the wind began shifting the Sheffield was steered by compass W. N. W.; that her fog signal of one blast was blowing regularly, as required by law and the circumstances; that the water was smooth, and the wind, at the time of the collision about to be described, was light. The collision is then described in the libel as follows: "That about 4:40 o'clock the whistles of two steamers were heard. One, a loud whistle, was comparatively near; but, at first sounding nearly abeam, it passed, and required no further attention. The other was the faint, faraway sound of the steamer's whistle, nearly ahead, which steamer proved to be the North Star, and with which last-mentioned steamer the Sheffield, fifteen minutes later, came in collision, as hereinafter shown. The Sheffield's engine was at once checked, and close attention was paid to locate the direction of the whistle when it should sound again. It was heard again, a little on the starboard bow. The Sheffield was thereupon, the second time, checked, and to a speed so slow that, as afterwards appeared, she had not good steerageway, and a passing signal of two distinct blasts was blown to the approaching steamer. No answer was received. The signal was repeated by the Sheffield, and she was starboarded half a point. The approaching steamer then replied with one blast, still a long distance away. To make certain whether this was blown as a fog signal, or as a passing signal in response to her own blast, the Sheffield, two or three times, blew the signal of two blasts, to each of which signals the approaching steamer responded directly with a distinct signal of one blast. Thereupon, the Sheffield, acquiescing in the proposal or demand of the approaching steamer to pass port to port, also blew a passing signal of one blast, and ported her wheel. The vessels were then a mile and a half to two miles apart, the North Star then being less than a point on the Sheffield's starboard bow. The Sheffield was not steadied until she headed about northwest by north. In executing the maneuver, it was seen that she had not sufficient steerageway, for which reason her speed was slightly increased, enough to give her steerageway. The whistle of the North Star was thereafter heard on the Sheffield's port bow, each vessel blowing to the other passing signals of one blast, which signal was exchanged repeatedly, the

Sheffield proceeding as last above described; and the vessels being—as, in accordance with said signal, they should be—on such courses that the sound of the North Star's whistle was broadening each time off the port, until she was well off on the port side of the Sheffield, and all risk of collision seemed to be past. In this situation, those on the Sheffield, for the first time, heard a signal of two blasts, for starboard helm, from the North Star, sounded fully four points off the Sheffield's port bow, the vessels being now too close to change sides by starboarding. The Sheffield answered with one blast, and hard ported. Again the North Star blew two blasts, which were answered again by one, and then the North Star swung up through the fog, heading for the Sheffield, two lengths or more distant on the port side, and coming at great speed; those forward on her hailing the Sheffield to go ahead strong, while the master of the Sheffield was at the same time signaling the engine room for full steam, and ordered her wheel amidships. The North Star came on at so great speed that she struck the Sheffield at about a right angle, by her port mizzen rigging, crushing in her side, and after that cutting into her a distance of six to eight feet, inflicting such damage that within five minutes the Sheffield sank, and became and is a total loss." The libelants allege that the North Star was in fault—First, in that, after selecting a mode of passing and establishing an understanding to pass port to port, by passing signals of one blast, she improperly departed from that course, and attempted the opposite mode of passing, to wit, starboard to starboard, when it was too late to safely make or attempt the change; second, in that she improperly starboarded; in that she was proceeding at an unnecessary, excessive, and illegal rate of speed; and, third, in that she did not adopt seasonable and proper means for avoiding the collision.

The Northern Steamship Company appeared as claimant, and filed its answer. The answer averred that at about 5 o'clock p. m., Buffalo time (27 minutes faster than Cleveland time), the North Star was proceeding on a course of S. E. ½ E., the usual course from Manitou island, to take her well off Whitefish Point, and that she was running under check, at a moderate and safe rate of speed, the wind being light from about N. W., and the sea nearly smooth. The collision, and the circumstances which led up to it, are thus described: "While running along in this way, shortly after 5 o'clock, the lookouts heard, and reported to the master, a signal of a steam vessel bearing about three-quarters of a point from the starboard bow. The signal was heard by the master at the same time, and, although indistinctly, it was made out to be two blasts of a steam whistle, from some vessel approaching. At the moment when the said two blasts on the whistle were heard as aforesaid, it was well known to those in charge of the North Star that the said signal was a passing signal of some vessel bound up Lake Superior, and in all probability in a parallel course with that of the North Star, and that if each of the vessels pursued her respective course no collision could occur, as the vessel which blew the signal was well off the starboard bow, inland, with miles of open lake between her and the nearest land to the south. The signal of the approaching vessel was promptly answered by two clear and distinct blasts of the steam whistle of the North Star. In less than a minute after the North Star so answered as aforesaid, the second signal of two blasts was heard from the same vessel, still on the starboard bow of the North Star. This was again answered by two clear and distinct blasts of the North Star's whistle. Again the approaching vessel blew a signal of two blasts, and again the North Star answered with two blasts. As there appeared to be no disagreement between the vessels as to their signals, or the mode of passing, and as the approaching vessel was still on the starboard, there seemed to be no reason why any danger of collision should be feared. After the last two blasts of the North Star, mentioned above, were given, the approaching steamer, which afterwards proved to be the Sheffield, suddenly blew a signal of one blast of her whistle, still off the North Star's starboard bow. As soon as this was blown, danger of collision was apprehended, and the North Star promptly answered this signal last blown by the Sheffield by adhering to her passing signal of two blasts: and her master immediately took the precaution to check down still further the speed of the North Star, which was then moderate. The Sheffield, however, again blew a signal of one blast of her whistle, still on the North Star's starboard bow, but closer. The engine of

the North Star was then immediately stopped, and while this order was being obeyed the Sheffield hove in sight, near to, and heading across, the North Star's bow and course, from starboard to port. The vessels were then so close to each other that a collision seemed inevitable, but notwithstanding this, the master of the North Star immediately ordered her wheel to port, so that she might swing under the stern of the Sheffield, and possibly pass her, and ordered the engine to back, and immediately followed this order to back strong; and, in response to this order, every available pound of steam was given the engine, and the steamer was backing with full power. But, notwithstanding these precautions (there remaining sufficient headway), the Sheffield, which was still crossing her bows, threw herself in the North Star's way, so that the latter collided with and struck her just forward of the port mizzen rigging, and her great weight imparted such energy to the blow that she cut into the Sheffield's side four or five feet. At the time of the collision the North Star was backing strong, but knowing that the Sheffield was so injured that she could not float, and knowing that her crew were in danger, the master of the North Star stopped the engine of the latter, and then ordered it ahead, so that the bow of the North Star might be kept in the breach made by the collision until the crew of the Sheffield could be taken on board. When this had been accomplished, the North Star backed out of the breach, and in a few moments thereafter the Sheffield sunk."

The answer alleged that "the collision was brought about solely on account of those in charge of the Sheffield failing to observe the signals of the North Star, which had been blown in answer to the former's signal to pass starboard and starboard, and improperly, and without sufficient warning, and in too close proximity to the North Star, attempting to cross the latter's bow, so that it became impossible for those on the North Star to avoid a collision with her."

After the hearing in the district court the claimant and respondent filed an amendment to the answer, as follows: "That at the instant the Sheffield's signal of one blast (i. e. the first cross signal) was heard, as aforesaid, the orders to check, stop, back, and back strong were given by the master of the North Star, almost simultaneously, and were promptly obeyed, and that no perceptible period of time elapsed between the first order to check, and the final order to back strong."

The district judge (now Mr. Justice Brown), after hearing the evidence, reached the conclusion, with the aid of nautical assessors (see The North Star, 43 Fed. 807), that the Sheffield was guilty of four manifest faults, in failing to stop at four different times when by reason of the signals of the North Star, her officers must have been uncertain as to the course which the North Star was pursuing. One good reason for uncertainty on their part he found to be that the fog signal and the signal announcing a porting of the helm were single blasts, differing only in length, so that it necessarily involved a risk of collision for the Sheffield's master to assume that single signals from the North Star indicated an agreement to pass port to port, and thereupon to port his helm on that assumption, without stopping to ascertain definitely its correctness. He held that the North Star was at fault in failing to stop and reverse at the first cross signal of the Sheffield, and also in running at a speed which was not moderate. The question of damages was referred to a commissioner, who reported that the damage suffered by the owners and crew of the Sheffield amounted, with interest to the date of report, to $177,214, and that the damage to the North Star amounted to $7,110.65; and the court awarded to the libelants the sum of $85,051.67, being the one-half of the total damages arising out of said collision, including interest to the date of the decree. The decree in the circuit court was entered by Mr. Justice Brewer, without a hearing, for $95,895.75, which included interest on the amount of the decree of the district court to the date of the decree in the circuit court.

Robert Rae and Charles E. Kremer, for appellant.

Harvey D. Goulder, for appellees.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

TAFT, Circuit Judge, after stating the case as above, delivered the opinion of the court.

Section 4233 of the Revised Statutes provides that "the following rules for preventing collisions on the water shall be followed in the navigation of vessels of the navy and of the mercantile marine of the United States." Rule 21 following, is: "Every steam vessel, when approaching another vessel so as to involve risk of collision, shall slacken her speed, or if necessary, stop and reverse; and every steam vessel shall when in a fog, go at a moderate speed."

By act of March 3, 1885 (23 Stat. 438), congress provided "that the following revised international rules and regulations for preventing collisions at sea shall be followed in the navigation of all public and private vessels of the United States upon the high seas and in all coast waters of the United States except such as are otherwise provided for, namely." Then follow 27 rules for navigation. Section 2 provides "that all laws and parts of laws inconsistent with the foregoing revised international rules and regulations for the navigation of all public and private vessels of the United States upon the high seas, and in all coast waters of the United States, are hereby repealed, except as to the navigation of such vessels within the harbors, lakes and inland waters of the United States."

By act of August 19, 1890 (26 Stat. 320), congress enacted that "the following regulations for preventing collisions at sea shall be followed by all public and private vessels of the United States upon the high seas and in all waters connected therewith by sea going vessels;" and then follow 31 articles for the navigation of vessels. Section 2 of that act provides that all laws or parts of laws inconsistent with the foregoing regulations for preventing collisions at sea, for the navigation of all public and private vessels of the United States upon the high seas, and in all waters connected therewith, navigable by seagoing vessels, are hereby repealed. Section 3 of the act provides that this act shall take effect at a time to be fixed by the president, by proclamation for that purpose. The president has never issued his proclamation, and the act of 1890 is not yet in force. The Britannia v. Cleugh, 14 Sup. Ct. 795, decided by supreme court of United States, April 23, 1894. Moreover, the collision in this case occurred in June, 1889, so that the act could not apply, even if it were in force. The act of 1885 only repealed the previous navigation rules so far as they affected the navigation by United States vessels of the high seas and coast waters, but it expressly excepted from its application the navigation of such vessels within the harbors, lakes, and inland waters of the United States. Now, it is true that the supreme court of the United States has construed the term "high seas," as it is used in Rev. St. § 5346, denouncing certain offenses "upon the high seas, or in any arm of the sea, or in any river, haven, creek, basin, or bay, within the admiralty jurisdiction of the United States, and out of the jurisdiction of any state," to include the open, uninclosed waters of the Great Lakes; but we do not think it can be given

such a meaning in the act of 1885, where there is a special exception in reference to navigation on "harbors, lakes, and inland waters." This exception manifestly includes the Great Lakes, and leaves section 4233 in force, as to navigation upon them. It follows that section 4233, Revised Statutes, furnishes the navigation rules applicable to the collision we have here to consider.

The first paragraph of rule 21 of section 4233, given above, is identical with article 18 of the British navigation rules, and the second paragraph is found in another article. Many English cases involving the proper construction of the language of rule 21 are found in the Law Reports, and are here directly applicable.

The leading case on the subject in England is The Ceto, 14 App. Cas. 670. In that case the Lebanon and the Ceto—two steamships—were approaching each other, in the open sea, in a dense fog. The Lebanon had reduced her speed to "easy," while the Ceto, which had already been crippled by another vessel in the same fog, was going "dead slow." The master of the Ceto first heard the whistle of the Lebanon about a mile away, and from what seemed to be four points upon his port below. He ported her helm, and edged off to starboard about two points. The Lebanon's whistle, notwithstanding the Ceto's change of helm, continued to draw nearer, and appeared to bear, as at first, four points from the Ceto. A collision resulted, and the discussion of the house of lords was as to the proper construction of article 18. Lord Watson states the effect of the article as follows:

"When the approaching vessels are enveloped in fog, and cannot see each other, the rule must, in my opinion, apply with greater stringency. Their respective officers are in that case guided solely by their sense of hearing, which may enable each of them to speculate with more or less accuracy as to the position of the other vessel at the time when its fog whistle is heard. But the direction from which the whistle comes can afford no indication of the course of the approaching vessel, unless the sound is repeated and its bearing is, on each repetition, carefully observed. Even then the bearing of the vessel, and its course, are more or less matters of speculation, and cannot be ascertained with the same certainty as if her hull or lights were in view. When two steamships, invisible to each other by reason of a thick fog, find themselves gradually drawing nearer, until they are within a few ship's lengths, they are, in my opinion, within the second direction of rule 18; and each of them ought at once to stop and reverse, unless the fog signals of the other vessel have distinctly and unequivocally indicated that she is steered on a relatively safe course, and will pass clear, without involving risk of collision. In the absence of such indications, it humbly appears to me that to negative the necessity for stopping and reversing when the vessels are near to each other, though still unseen, would be to thwart the very purpose for which the rule was enacted."

Lord Watson quotes with approval this language of the master of the rolls in The John McIntyre, 9 Prob. Div. 135, as follows:

"It may be laid down as a general rule of conduct that it is necessary to stop and reverse, not, indeed, every time that a steamer hears a whistle or fog horn in a dense fog, but when, in such a fog, it is heard on either bow, and approaching, and is in the vicinity, because there must then be a risk of collision."

And then continues:

"When the approaching vessel is nearly ahead, the duty to stop and reverse is obvious; but it appears to me to be equally imperative when the

other vessel is drawing near, upon either bow. It matters not whether the bearing of the approaching ship be one point or four. Either position is fraught with danger of collision, if it continues to advance without change of bearing."

Lord Herschel put the rule in this way:

"I think that, when a steamship is approaching another vessel in a dense fog, she ought to stop, unless there be such indications as to convey to a seaman of reasonable skill that the two vessels are so approaching that they will pass well clear of one another."

The same principle is laid down in the cases of The Kirby Hall, 8 Prob. Div. 78; The John McIntyre, 9 Prob. Div. 135; The Dordogne, 10 Prob. Div. 6; The Ebor, 11 Prob. Div. 25; The Lancashire [1894] App. Cas. 1.

Said Mr. Justice Brown in the case of The City of New York, 147 U. S. 72–84, 13 Sup. Ct. 211:

"There is no such certainty of the exact position of a horn blown in a fog as will justify a steamer in speculating upon the probability of avoiding it by a change of the helm, without taking the additional precaution of stopping until its location is definitely ascertained." Citing The Ceto, 14 App. Cas. 670.

See, also, The Martello v. The Willey, 14 Sup. Ct. 723, decided by the supreme court of the United States April 16, 1894, where the same learned justice referred with approval to the English cases above cited.

In this connection, it is useful to refer to rule 16 of the act of 1890 (26 Stat. 320) which, though not governing the conduct of the masters of the vessels in this case, as a positive law, is significant, as showing the views of congress, and the experienced navigators who prepared it, in respect to the duty of vessels in a fog. The part of the rule here material is as follows:

"A steam vessel hearing, apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained shall, so far as the circumstances of the case admit, stop her engines and then navigate with caution until danger of collision is over."

It, after all, comes to this,—and such is the proper construction of rule 21: That where a steam vessel is approaching another vessel in a fog, so that the bearing of the whistle of the one is a few points off either bow, it is the duty of the master of the approaching vessel to stop his vessel, and, if necessary reverse, until the exact position and course of the other vessel can be ascertained, unless such circumstances present themselves to him at the time as would lead a reasonably prudent and skillful navigator to the confident belief that no risk of collision exists.

Having thus, as definitely as may be, formulated the standard of due care by which the conduct of a steam vessel colliding with another in a fog is to be measured and its legal responsibility for the resulting damage fixed, we come now to apply it to the facts of this case.

Lord Watson, in giving judgment in the house of lords in The Ceto, 14 App. Cas. 670, 687, reports Lord Esher, the master of the rolls, to have said in the court of appeals, in the same case, that "You can never try an admiralty case, so as to get at the truth, unless you look with great scepticism at the evidence on both sides."

This remark has full application to the evidence given here by the officers and crews of the two colliding steamers; but the case at bar differs from most collision cases, in that the respondent, in corroboration of the story of its officers and crew, has summoned, from the deck of a third vessel, witnesses, who, so far as this record shows, are entirely indifferent between the parties. The great conflict of evidence in the case is in regard to the signals which were given by the two steamers as they approached the point of collision. The Badger State, a steamer of the Western Line, was sailing on Lake Superior from Manitou island to Whitefish Point, on a course very nearly parallel with that of the North Star, on the afternoon of the collision. It is contended on behalf of the North Star that the Badger State was near enough to the point of collision to enable her officers and crew to say what signals were exchanged between the North Star and the Sheffield. We think the evidence fully supports this contention. The mate and the lookout of the Badger State testified that when the fog lifted for a time, about 1 o'clock in the afternoon, they saw a steamer of the Northern Steamship Line three points off their port quarter; that she was sailing a parallel course with that of their own steamer; that they saw her again when the fog lifted, between 3 and 4 o'clock; that early in the afternoon she was three or four miles away, but that at 4 o'clock she had gained on the Badger State, and was considerably nearer. It was conceded that the steamers of the Northern Steamship Line had peculiarities in their spars and rigging which easily distinguished them from other vessels at such distances. During the afternoon, when the fog was dense, the whistle of this vessel was constantly heard by the mate, the lookout, the captain, and the wheelman of the Badger State, over the port quarter. Their estimate is that, from 4 o'clock on, there was not more than a mile or a mile and a half of clear water between their courses, and that the following vessel was not more than two miles astern. The North Star was the only east bound vessel of the Northern Steamship Line which was where the crew of the Badger State could have seen her, or heard her whistle, on that afternoon. The Badger State had a chime whistle, made by a union of three whistles, and its sound was easily distinguishable from that of a single or "solid" whistle. Some four of the witnesses from the deck of the North Star testify to having heard the chime whistle, which was a peculiarity of the boats of the Western Line, during the afternoon, until shortly before the collision. Its bearing was somewhere about three points over the starboard bow of the North Star. The time of the collision was fixed by the witnesses for the libelants at 4:57 p. m., Cleveland time, or 5:24, Buffalo time. It was fixed by the witnesses from the North Star at about 5:30 p. m. The men of the Badger State say that about 5 o'clock, Buffalo time,—probably between 5 and half past 5,—they exchanged single-blast signals with a steamer going by them on their port side, on the usual course from Whitefish Point to Manitou, at full speed, a half a mile or a mile away. One or two of the witnesses saw her smoke, but the fog was too dense to see the vessel. This vessel

continued her fog signals after she had passed a mile astern of the Badger State, when those upon the deck of the latter heard her give a blast of two whistles, which was answered by two whistles from the boat of the Northern Steamship Line following the Badger State. The double blasts were exchanged twice again, or three times in all; then came a single blast from the west-bound vessel; and then all was still. The cross signal was observed and commented on at the time by the captain of the Badger State, in the hearing of the other witnesses, from her deck. When the Badger State arrived at Sault Ste. Mary's river, the next day, those on board of her were informed of the collision. The account of the exchange of double blasts, and the cross signal of one blast from the west-bound vessel, corresponds in many respects with the story given by the men of the North Star. In the protest of the master of the Sheffield, made at Sault Ste. Mary's on the day after the collision, he states that just about the time when he first heard the whistle of the North Star, three-quarters of a point on his starboard bow, some miles away, he heard the whistle of a vessel on his port side, nearly abeam, and comparatively near. On the stand, the Sheffield's witnesses deny that this was a chime whistle; but as they profess to have heard it only once or twice, and to have given little attention to it when they did hear it, because then all danger from it was past, and their ears were strained to hear the signal of the North Star, nearly ahead, we may dismiss this discrepancy as of small moment.

Counsel for libelants attempted at the trial to show that the Badger State could not have been at the point of collision, because of the time at which she reached Whitefish Point. Her officers say that she passed there at about 2 o'clock next morning, after stopping for an hour, and running the rest of the time at half speed, or 5½ miles an hour. The argument was that, in the eight hours and a half between half past 5—the time of the collision—and 2 o'clock the next morning, she could only have gone between 40 and 45 miles, while the collision is said to have taken place about 60 or 65 miles from Whitefish Point. We do not regard this evidence as of any great weight. It depends on the memory of the mate and captain of the Badger State as to the speed of their vessel during a certain eight hours of a long trip, with respect to which they might much more easily be mistaken than they could as to the circumstances that they were followed within a few miles by the North Star that afternoon, that the Sheffield passed them, that double signals were exchanged, and that then a cross signal followed, all of which must have been deeply impressed in their minds, both by the unusual character of the occurrence, and by the fact of the collision of which they learned the next day. The log of the Badger State, produced in the circuit court, shows that the memory of her officers, as to her speed, was defective. More than this, the location of the collision itself depends on measurement of distance by the estimated speed of the Sheffield, and her time from Whitefish Point, which is by no means exact. On the whole, we think the proximity

of the Badger State to the place of the collision is as satisfactorily
established as such a fact can be. The testimony of the witnesses
who stood upon her deck is therefore to be accepted as applicable
to the collision in controversy, and it clearly makes the evidence
for the North Star preponderate, in so far as the men of the
North Star and the Badger State agree. The chief point of agree-
ment is that the Sheffield and the North Star exchanged double
blasts a short time before the collision, as an agreement to pass
starboard to starboard, and that subsequently this agreement was
broken by a cross signal from the Sheffield. The story from the
Sheffield is that she first heard the whistle of the North Star three-
fourths of a point on her starboard bow, five miles away, that she
blew two single blasts and then, reducing her speed to four miles
an hour, and starboarding a half point, she blew four or five
double blasts, at a minute apart; that she heard three single blasts
in answer from the North Star, and that then, when two miles
away from the North Star, she ported from a course N. by W. ½ N.
three points and a half to one N. W. by N.; that, on this latter
course, she exchanged seven blasts of one whistle with the North
Star; that the bearing of the North Star widened on her port bow
from three points, immediately after porting, until it was six
points; that then, suddenly, a blast of two whistles was heard
from the North Star, to which she gave a response of one, hard
ported, and swung around to a course N., or E. of N., and was
struck by the Star at right angles, just abaft the mizzen rigging.
The evidence from the Badger State satisfies us that the Sheffield's
witnesses put her double blasts much further from the collision,
in point of time, than the fact justified, and that, when she did
blow double blasts, they were answered by double blasts from the
Star. The exchange of seven single blasts after the Sheffield
ported, and the great widening off her port bow of the North Star
whistle, till it reached six points, we do not believe. To say that
the Star's whistle was six points off the port bow of the Sheffield
puts her in a perfectly impossible position, and discredits all this
part of the Sheffield's story. The learned district judge thought
there was exaggeration in this statement as to the number of
one-blast signals after the Sheffield ported, and we fully concur
with him. The recklessness of the Sheffield, in porting, instead
of stopping and reversing, to ascertain with certainty the position
and course of the North Star, appears greater as the time and
place of the porting is found to be nearer to the collision. There
was an obvious motive on the part of the Sheffield's witnesses,
therefore, to make the time between their porting and the collision
as great as possible. This is the explanation of the exchange of
seven single blasts a minute apart, just preceding the collision,
made so prominent a part of the Sheffield's story. The attempt
to sustain it by the evidence of King, the porter of the North
Star, who had been discharged for drunkenness, failed because of
his previous contradictory statement, his manifest motive, and his
insufficient opportunities for observation. His story comes to this:
That the Star was taking one course, and was giving repeated

signals to the Sheffield that she was taking another. We cannot accept this as credible until it is established by indubitable proof. Neither master can be supposed to have sought a collision, and yet misleading signals, repeated five times, could have no other explanation.

For the same reason, we cannot believe that the Sheffield ported her helm, and then blew signals to indicate that she was keeping her course. The only reasonable explanation is that suggested by the district judge,—a confusion of signals. The Sheffield mistook a double blast from the Star for a single blast, or perhaps two of them, and, without stopping to ascertain the Star's exact position and course, recklessly took it for granted that she was going to port, and herself ported, and thus ran across the bows of the Star. Of course, this was reckless navigation, and gross negligence, for which she must be condemned. On her own story, the district judge thought the Sheffield guilty of three or four faults. As we find the fact to be, we think her recklessness and negligence even greater. She has not appealed from the decree against her; but it is claimed in her behalf that the appeal of the North Star gives this court the right to modify the decree below so as to enter a full decree against the Star for all the damages. This is denied by counsel for the North Star, who contend that the decree, in so far as it fixes the faults of the Sheffield, not being appealed from, is res judicata, and cannot be disturbed. The question of practice thus presented, we do not feel called upon to decide, because, if the question is open to us, we have no hesitation in convicting the Sheffield of gross fault.

The much more doubtful question is as to the conduct of the North Star. As we have already said, we think that there was an exchange of double-blast signals between the two vessels when they were a mile or less apart, but that the Sheffield mistook some of the answers by the Star for single blasts, and ported. It is probable, also, that those navigating the Star did not at once perceive the change of signal by the Sheffield. The question is, had the master of the Star reason to doubt whether the Sheffield was keeping a course to the starboard of him? If so, then there was risk of collision, requiring him to stop and reverse. The bearing of the Sheffield's whistle when the master of the Star says he first heard it was three-fourths to one point over the starboard bow. He places the Sheffield only half a mile away at that time. If so, their courses, assuming them to have been nearly parallel, were only 500 feet apart. He then starboarded his helm half a point, and a minute later heard the approaching whistle a point and a half over the starboard bow. This was not a widening off his bow, which could indicate to him that the Sheffield was on a course which would certainly go by him, because he had starboarded half a point, and that change in his own course was nearly enough to account for the change in the bearing of the Sheffield. A minute later, he says, he heard another whistle, still only a point and a half off the starboard bow. If his judgment of the bearing was correct, this was conclusive evidence that the Sheffield was on a course drawing

nearer and nearer to his own. The next signal, a minute later, he recognized as a single whistle that bore only a point and a quarter off his bow, and at the next one the Sheffield hove in sight, and shot across his bow. It is true that two North Star witnesses, in their evidence, widen the bearing of the whistles more on the starboard bow, with each recurring whistle, than does the master; but they are by no means positive in their recollection, and he is explicit on this subject. Moreover, they did not communicate to him their judgment of the bearing of the approaching whistles. He was responsible for the navigation of the North Star, and his responsibility is to be determined by that which he saw and heard. The event showed that his judgment as to the bearing of the whistles was correct.

It is true that the agreement to pass starboard to starboard, if it had certainly been established, would have been good ground for the master of the Star to suppose that the Sheffield would keep off to starboard, but could he be certain that the agreement had been safely established? With a vessel only five minutes away from him, in a dense fog, and but a point off from dead ahead, it was his duty to note with care the bearing of each whistle. Says Marsden on Collisions (2d Ed. p. 350):

"In practice, one of the most usual indications of risk of collision is that the approaching ship remains upon the same bearing from the observing ship for an appreciable length of time."

In article 16 of the act of 1890, to prevent collisions at sea (26 Stat. 320), appears the following:

"Risk of collision can, when circumstances permit, be ascertained by carefully watching the compass bearing of an approaching vessel. If the bearing does not appreciably change, such risk shall be deemed to exist."

The act in which this language appears is not, as we have found, applicable to the collision in this case, but it is evidently only declaratory of a well-understood rule of prudent navigation, and is useful here as such. The master of the North Star could not be certain that he had correctly placed the whistle, nor could he, as is evident from what happened, be sure that he had correctly interpreted the signals of the approaching vessel. The vessel was getting nearer and nearer. The bearing was suspicious, to say the least. There was a risk of collision when he heard what he took to be the third double blast of the Sheffield. He ought then to have stopped his engines. If he had done so, there would have been no collision. We think that reasonable care on his part required this course. To go on was to risk collision, and that was a violation of the twenty-first rule. Even if he was not required to stop, under such circumstances, he should at least have reduced his speed to the lowest point consistent with retention of control of the vessel. The North Star would steer at a speed of four miles, and perhaps less. It is conceded by the witnesses that at this time she was running at least five miles an hour, and probably a half mile or a mile more. A reduction of speed at the time of the third whistle heard from the Sheffield, by a mile and a half or two miles an hour, would have enabled the Star to stop her headway before the Sheffield was

struck, if it is true, as claimed by the witnesses for the Star, that her headway, at the time of the collision, was not more than a mile an hour.

The master of the North Star says in his protest that the first whistle he heard from the Sheffield was a fog whistle, and that the double blasts came afterwards. This accords with the probabilities, because, until the Sheffield began to blow double blasts, she had been blowing single blasts. She was doing this as she passed the Badger State, and until she had passed a mile astern of that vessel. It would be singular if some of these blasts had not been heard by those upon the North Star. A light breeze was blowing from W. N. W., but certainly not enough to prevent the North Star's men from hearing whistles several miles to leeward. Otherwise, how could the Star have heard the chime whistle of the Badger State, three points off her starboard bow, nearly down to the time of collision? We do not think the evidence of the North Star witnesses to the contrary overcomes the evidential weight of the statement in the protest, or of the inferences to be drawn from the testimony of those on the Badger State, that the double blasts from the Sheffield were not the first whistles heard by those on the North Star, but that single blasts must have been heard before. The moment such a single blast was heard, the master of the North Star should have reduced her speed to the lowest point, and even the subsequent double blasts, with their suspicious bearing, would not have justified any increase of it.

It has been pressed on us with great force that we should not apply the same rule in this case as was applied in the English cases cited, because of the very marked difference in the circumstances. It is said—with what accuracy it is not necessary to discuss—that in all those cases the collisions occurred where the usual courses of vessels crossed, while here the master of the North Star knew that the vessel approaching was necessarily on a course parallel, or nearly parallel, with his own, and that she would naturally pass to his starboard if she kept on her course, and did not port. When, therefore, he established an agreement to pass starboard to starboard, it is said he had the right to feel entirely secure. Considering the uncertainty of sound in a fog, we cannot concede that the master of the Star had sufficient ground for a feeling of entire security when the first whistle he says he heard showed the vessel only half a mile away from him, and but 500 feet off his course, and the bearing of the subsequent whistles showed, not parallel, but converging, courses.

But suppose that we have been too stringent in respect to the conduct of the master of the North Star when he thought he was in agreement with the Sheffield. How was it when he heard the first cross signal from the Sheffield? In the answer for the North Star, the averment is that at the first cross signal the speed was only checked, that the engines were not stopped until the second cross signal, and that they were not reversed until the vessel hove in sight, a little later. On the stand the witnesses for the North Star, except one, said that the signals to check, to stop, to back, and

to back strong, were given together, with only space enough between them to distinguish them, and that they were given at the first cross signal. After the hearing in the district court the answer was amended to include such an allegation. One of the North Star witnesses says that the signal to check was given at the time of the first signal, and that the signals to stop, back, and back strong did not come for half a minute afterwards. The signal to check was three bells, the signal to stop was one bell, the signal to back was two bells, and to back strong was two bells. The signal to stop and reverse strong could have been given with just two bells, without any intermediate signals. We fully concur with the district judge in thinking that the original answer, and the character of the signals which were given, establish the fact to be that at the first cross signal the only order was to check, and that the signals to stop and to back were not given until the second single blast of the Sheffield. This delay was a fault. The cross signal of the Sheffield meant imminent danger of collision, and nothing but a signal to stop and back strong would satisfy the requirement of the situation. If the time between the first and second cross signals was but half a minute, the use of this time in reversing would have saved the Sheffield, if, as claimed by respondent, the headway of the North Star was but a mile an hour when she struck. It is suggested that the first cross signal was near enough to the collision to make what was done at that time in extremis, so that the master of the North Star could be charged with an error of judgment only, in checking instead of stopping and reversing. It is said that he could not then know whether it was safer for him to go on than to stop and reverse. We cannot agree with this. The rule requires that when there is risk of collision a steamer shall stop and reverse, and the rule is to be followed, unless the circumstances justify and require a departure from it. The approaching vessel was heard approaching from a direction but little more than a point off the starboard bow, and the rule had full application at that time. The nearer the vessels came to each other, under such circumstances, the more necessary it became to stop and reverse, for the master had not reasonable ground to suppose that the approaching vessel would go under his stern if he went on.

Much evidence is contained in the record in reference to the speed of the North Star. Her full speed was 12 miles an hour. The district judge found that just before the collision her speed was nearly 10 miles an hour. She could steer at 4 miles an hour or less. Rule 21 requires her speed to be moderate in a fog. It is conceded that in going at 10 miles, or even at 8 miles, an hour, she could not have stopped in the distance in which, in that fog, she could have seen an approaching vessel. Eight or 10 miles an hour, when a vessel was approaching her from a direction only a point off her bow, would therefore be excessive speed. The Bolivia, 1 U. S. App. 26, 30, 1 C. C. A. 221, 49 Fed. 169; The Nacoochee, 137 U. S. 330, 11 Sup. Ct. 122. What was the fact concerning her speed? The evidence of the Star's own witnesses on this subject is by no means

satisfactory. The chief engineer's statement as to the reduction effected by one check was that it reduced the revolutions from 74 to anywhere from 38 to 50. The North Star was running under one check. What that check usually was, her engineer could not give, with any exactness. The second engineer, who was on watch during the afternoon, says that the captain sent him word to go more slowly between half past 4 and 5, and that at 5 o'clock her revolutions were "somewhere along" about 35 or 36. This would be from 5½ to 6 miles an hour. The evidence of the other witnesses is of that vague and general character which much detracts from its weight. The mate says he thinks she was going five miles and a half an hour but would not be positive that she was not going seven or eight miles. All the witnesses on the Sheffield say that the North Star was turning up the water in front of her cutwater as she came into the Sheffield, while this is denied by the lookout and the watchman, who say they looked over her bow just before the collision. She could not thus carry "a bone in her teeth" (as the sailors' phrase is), except when running at a speed of eight miles an hour, and upward. The log of the Badger State shows that she was running nine or ten miles an hour nearly all the afternoon before the collision. If so, this must have been the speed of the North Star, for the two vessels were in company during that time. It is claimed that there are erasures in the log of the Badger State which show a change from a lower speed to higher speed. It is difficult to discover any motive for mutilation of the record by the persons in whose custody the log was, and we are inclined to think that the erasures were nothing but the work of those who originaly made the record, at the time of making it. The protest of the North Star's master fixes the place of the collision about 70 miles from Keweenaw Point, and so does the evidence of the Sheffield. If so, she ran 12 of these miles between 3 and 4 at full speed, and the rest under check in five hours and a half, for she left Keweenaw Point at about 11 o'clock. This would make her speed under check between 8 and 10 miles an hour. While it is true that she might have run at greater speed during the afternoon, and slackened her speed just before she heard the Sheffield to half of 10 miles an hour, we do not think it probable. We are therefore not disposed to differ from the district judge in this finding. Expert evidence was taken to show that if the North Star had been going more than five miles an hour, when she checked, stopped, and reversed, the penetration of her bow into the Sheffield would have been much deeper. Other experts called by the libelants took a different view, and made a conflict. It seems to us, from an examination of this evidence, that it is largely conjectural, and is not to be depended upon, because of the very vague knowledge which the experts could have of the character of the hole made in the Sheffield's hull, and the amount of its metallic resistance to the blow. On the whole case, we cannot find enough in the record, contrary to the findings of the district judge, to warrant us in setting aside his decree, in so far as it holds both vessels at fault, and liable to share the loss.

We have been pressed with the argument in this case that in view

of the recklessness which both the district court and this court have found in the navigation of the Sheffield, and which is, in itself, sufficient to account for the collision, all reasonable doubt should be resolved in favor of the North Star. It is said that the burden upon the manifest wrongdoer is greater than merely to show by a preponderance of evidence that the other vessel was guilty of fault, and, further, that a slight fault is no ground for dividing the damages. It may be conceded that the principles of law involved in the foregoing propositions are supported by authority. The City of New York, 147 U. S. 72–85, 13 Sup. Ct. 211; The Great Republic, 23 Wall. 20. But, for the reasons given above, we are of opinion that the faults of the North Star are sufficiently established by the proof, within the rule suggested, and that but for them the collision would have been avoided. The faults of the North Star are chiefly shown by the evidence from her own deck, and the learned district judge based his conclusions in regard to them almost entirely on the case as stated in the protest of her captain, and the pleadings of her owners. Giving to the findings of the district court the weight in such a discussion they are necessarily entitled to, we are unable, in view of all the circumstances, to dissent therefrom.

The district judge allowed interest on the total value of the Sheffield. He stated his reasons as follows:

"With reference to the allowance of the item of $12,000 interest upon the total value of the Sheffield (which the commissioner puts at $160,000), I have felt more doubt. The Sheffield was guilty of so many faults in connection with this catastrophe that I have been strongly disposed to reject this item of interest, as its allowance is a matter of discretion; but, upon reflection, I am satisfied that with regard to the main fault, viz. the failure to stop and reverse,—a fault but for which the collision would not have occurred,—the steamers were equally to blame. In addition to this, there was a frankness upon the part of the Sheffield officers and crew, in admitting their faults, which, while it does not disarm criticism with respect to their conduct, inclines one to take as favorable a view of their case as the facts will warrant. Upon the other hand, there was such a marked discrepancy between the testimony of the men upon the Star, and the statements made by them in their protest, and even in their answer, and such obvious improbabilities upon the face of their testimony, that there is raised in my mind something more than a suspicion that their intention was to make the testimony, so far as possible, fit the exigencies of their case, as they had been developed by the libelant's evidence,—a practice very common in collision cases, and one which the English rule with regard to the filing of preliminary acts was intended to provide against. Upon the whole, I have concluded not to disturb the report of the commissioner upon this point."

We are constrained to differ with the foregoing, both in respect of the comparative delinquency of the two vessels, and of the credibility and candor of the two crews. It seems to us that the fault of the Sheffield, in porting so near the point of meeting, and crossing the bows of the North Star, involved gross recklessness, while the faults of the North Star were more excusable. Moreover, we are convinced that the story of those from the deck of the Star is much nearer the truth than that of the Sheffield's witnesses. With respect to circumstances, their account of which was manifestly impossible, the officers and crew of the Sheffield preserved a uniformity of statement only to be explained by previous agree-

ment. If the district judge's conclusions that the faults of the two vessels were equal, and that the Sheffield's witnesses were more truthful than those of the North Star, justified him in exercising a discretion to allow interest which otherwise he might have withheld, it would seem that we, differing from his conclusions in these respects, and hearing the case de novo, as we do in admiralty appeals, should exercise our discretion, and modify the award of damages by excluding the item of interest. It is well settled in this country that the question whether interest shall be allowed by the court of first instance, or by the appellate court, in admiralty, on the amount of damages awarded in a collision case, is one in the discretion of the court. Hemmenway v. Fisher, 20 How. 258; The Ann Caroline, 2 Wall. 538; The Scotland, 118 U. S. 507, 6 Sup. Ct. 1174.

We shall therefore modify the decree of the circuit and district courts, and divide the damages, exclusive of any interest on the reported value of the Sheffield, and award half the costs of the court below and of this appeal to each party. Let a decree be entered accordingly.