## THE GEORGE W. ROBY (three cases.)

### (Circuit Court of Appeals, Sixth Circuit. October 8, 1901.)

### Nos. 914–916.

**1. COLLISION—PASSING STEAMERS ON GREAT LAKES—RULES GOVERNING NAVIGATION IN FOG.**

The steamer Florida, passing down Lake Huron in a dense fog at a speed of not less than six miles by the testimony of her own witnesses, first heard a passing signal of two whistles from a vessel almost directly ahead and not over half a mile distant. She answered with the same signal, and starboarded her helm, but kept her speed. A minute later she saw the other steamer two lengths away and on a course crossing her own, and she then increased to full speed in an attempt to cross ahead, but a collision occurred, in which she was at once sunk. *Held*, that she was in fault in respect to her speed, in violating Rule 15 of the rules governing the navigation of the Great Lakes (28 Stat. 645), which provides that "a steam vessel hearing, not more than four points from right ahead, the fog signal of another vessel, shall at once reduce her speed to bare steerageway and navigate with caution until the vessels shall have passed each other," and because prudent and cautious navigation required her, under the circumstances, on hearing the signal so near, to at once stop and reverse until the position and course of the other vessel could be ascertained with certainty, and she was not justified upon the apparent hearing of a single passing signal in neglecting such precautions.[1]

**2. SAME.**

The statutory rules enacted in 1895 to govern navigation on the Great Lakes (28 Stat. 645) expressly provide, in Rule 23, that they shall not operate to exonerate any vessel from the consequences of "any neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case," and such rules do not supersede any usual requirement of prudent navigation not inconsistent with their positive provisions. In determining what constitutes the "cautious" navigation required by Rule 15, after vessels approaching in a fog have reduced their speed as therein provided, under the circumstances of any particular case, resort must be had to the general principles and requirements established by the decisions of courts of admiralty; and a vessel will be held in fault for a failure to stop and reverse in such case, where prudent navigation required it.

**3. SAME—EXCESSIVE SPEED IN FOG.**

The steamer George W. Roby, going up Lake Huron in a dense fog, heard fog signals some three miles ahead, which proved to be from the Florida passing down. She checked speed to four or five miles, which the evidence tended to show was not as low as she might have reduced and maintained steerageway. She continued to hear the fog signals, which were approaching and apparently keeping the same bearing, from one to three points off the port bow. When the vessels were some half a mile apart she blew two passing signals, of one blast each, at intervals, which were unanswered, and she then blew an alarm. There was a confusion of signals, but a passing agreement of two whistles was finally established, each vessel thinking such signal first came from the other. The Roby, on answering the supposed passing signal from the Florida, starboarded, and reversed her engines, but had not lost her headway when she struck the Florida and sunk her. The Roby had a lookout, but he was not on duty, the only lookout being the master on the pilot house, who was also engaged in navigating the vessel, giving

---

[1] Collision rules, see notes to The Niagara, 28 C. C. A. 532; The Mount Hope, 29 C. C. A. 368.

the signals, and blowing his fog whistle by hand. *Held*, that the Roby was in fault, (1) for not reducing speed to bare steerageway, as required by Rule 15, (2) for not maintaining a proper lookout, and (3) for not stopping and reversing, at least as early as the time when her second passing signal was not answered; since the fact that the bearing of the Florida as the vessels approached each other apparently remained unchanged should have advised the master that her course was drawing nearer his own, and that in proceeding he was running risk of collision.

4. SAME—FAILURE TO MAINTAIN LOOKOUT.

To exonerate a vessel from fault for a collision where she failed to maintain a lookout, although she was navigating in a dense fog, and with knowledge that another vessel was approaching ahead, the burden rests heavily upon her to show that the presence of a lookout could not have guarded against the collision.

5. SHIPPING—LIMITATION OF LIABILITY FOR COLLISION—NEGLIGENCE OF MASTER.

A vessel owner is not to be deprived of the right to a limitation of liability for damages caused by collision, under Rev. St. § 4283, for the misconduct of the officers or men of the vessel, to which he was not privy; and where a steamer was supplied with two watchmen, whose duty it was to serve as lookouts, the negligence of the master in failing to have a lookout properly stationed is not chargeable to the owners.[2]

6. COLLISION—TOTAL LOSS OF VESSEL—MEASURE OF DAMAGES.

Where a vessel is sunk in collision, and damages are awarded the owner on the basis of her total loss, he is not entitled to recover in addition for the loss of earnings under an unexpired time charter.

7. SAME—DISTRIBUTION OF DAMAGES BETWEEN VESSEL AND CARGO—EFFECT OF HARTER ACT.

The sole purpose of the Harter act is to modify the relations previously existing between the vessel and her cargo, arising from the contract of carriage; and the provision of section 3 exempting the owner from liability for faults or errors in navigation where his vessel was properly manned, supplied, and equipped, does not affect the operation of the equitable rule, which gives priority to the claim of the innocent cargo owners over that of the vessel owner against the fund available for the payment of damages sustained through a collision for which both vessels have been adjudged in fault.

8. SAME—STIPULATIONS IN BILL OF LADING.

Stipulations in bills of lading exempting the vessel from liability for cargo lost as the result of collision, or provisions that the carrier, if held liable for loss of cargo, shall have the benefit of insurance thereon, have no application to a case where the vessel is sunk and lost, with her cargo, through collision for which both vessels were in fault, and the second vessel is allowed to recoup one-half the cargo damages awarded against her from the damages awarded in favor of the sunken vessel; nor do they apply because the claim of the vessel sunk is postponed to that of her cargo owners, the fund being insufficient to pay in full. In such case the right of a recoupment does not depend upon the relation of the carrying vessel to her cargo, but upon the relation of the colliding vessels to each other, and the right of preference upon the equitable principle that where the fund available is insufficient to pay all claims those of the innocent cargo owners are to be preferred over those of one whose fault contributed to the loss; and no question of liability of the carrying vessel to her cargo owners is involved.

9. SHIPPING—PROCEEDINGS FOR LIMITATION OF LIABILITY—INTEREST ON BOND FOR RELEASE OF VESSEL.

Where the owners of a vessel, in proceedings for limitation of their liability for a collision, gave bond conditioned for the payment into court on its order of the appraised value of the vessel "and the interest on the

---

[2] Limitation of owner's liability, see note to The Longfellow, 45 C. C. A. 387.

same as provided by law," and thereafter contested their liability, the result being an award against the vessel exceeding its value, the stipulators are liable for interest on the bond from the date of its execution at the legal rate.

Appeals from the District Court of the United States for the Eastern District of Michigan.

The lake steamers George W. Roby and Florida came into collision on Lake Huron on the morning of May 20, 1897, by which the Florida was almost instantly sunk, and became a total loss, together with her cargo. Two libels were filed against the Roby, one by the owners of the steamer Florida, and the other by the British & Foreign Marine Insurance Company, as underwriters upon nearly all of the Florida's cargo. Subsequently, the Lakeland Transportation Company, the corporate owner of the Roby, filed a petition to limit its liability. In response to the monition under this petition, the owners of the Florida, for themselves as owners of the Florida, and as trustees for cargo uninsured, and for the effects of her officers and crew, filed an answer and claim. The British Insurance Company also filed its claim and answer, both answers setting up substantially the same state of facts alleged in the original libels. The case was tried first upon the questions of fault, before the district judge in open court, the witnesses being examined orally. The Roby and Florida were both held at fault. Upon this branch of the case it is much regretted that we have not the benefit of any finding of facts or statements of the faults found against either vessel, and we are left to conjecture as to the views taken by the learned trial judge of the really controverted questions in the case. The appraised value of the Roby in the limited liability proceeding was $59,300, and bond with security was given for this sum, and the vessel released. The aggregate of the claims proven and allowed was $118,379.30, the value of the cargo being more than one-half of this aggregate loss, and exceeding the stipulated value of the Roby. The court below held that the owners of the Roby were entitled to the benefit of the limited liability act, and awarded priority of payment to the cargo interests over both the hull or vessel interest and the claim of the officers and men for their effects. 103 Fed. 328.

The case here comes upon three separate appeals: (1) The owners of the Roby appeal upon the question of fault, claiming that the Florida was wholly to blame. (2) The owners of the Florida appeal upon the question of fault, claiming that the Roby was alone at fault. They also appeal from the decree awarding priority in payment to the cargo interests, and from the decree allowing the owners of the Roby the benefit of the limited liability act. (3) The British & Foreign Marine Insurance Company appeals upon the single ground that the court below erred in not construing the stipulator's bond, entered into by the owners and surety of the Roby, as bearing interest from date of its execution. The said propeller Florida was bound from Chicago to Buffalo, and at the time of collision was bound down Lake Huron, the place of collision being a few miles below False Presque Isle point. The propeller George W. Roby was bound up the lake on a voyage to Lake Superior. The Florida had a full cargo of wheat and sundries. The Roby had in tow the schooner William D. Becker, neither being loaded. The Florida was 275 feet long, 44 feet beam, and her gross tonnage was 2,100. The Roby was of about the same length, beam, and tonnage. The collision occurred about 9 o'clock in the morning. A fog of considerable density prevailed, neither of these steamers seeing the other until they were within about two lengths of each other. The wind was very light, being northerly, and there was no sea. There is much conflict as to the passing signals given by these steamers to each other, and greater still as to the order in which signals were given, and as to most of the material facts in the case. The place of collision is in the general track of the great commerce bound up and down Lake Huron, and is a locality where vessels bound to and from Lake Michigan and Superior pass very close together upon varying and uncertain courses.

For the Florida it is contended: (1) That she first encountered the fog about 40 minutes before the collision, and that her engines were at once checked, and that she afterwards proceeded at a moderate speed; (2) that the course of the Florida, from Presque Isle point until changed in response to a two-blast passing signal from the Roby, was S. E. ¾ S., or a quarter of a point outside of her ordinary course; (3) that in from 20 to 25 minutes after checking she heard the fog whistle of a steamer between 2 and 3 points off her starboard bow, which proved to be from the steamer St. Paul, bound up the lake on a course substantially parallel with that of the George W. Roby; that the Florida was then also blowing her fog signals as required by law; that the master was then on the pilot house in charge of her navigation, her second mate alongside of the master, blowing fog signals, and a lookout on duty forward on the spar deck, and that this lookout had no other duty than to keep a lookout and report signals and sounds; that the St. Paul and Florida each blew fog signals two or three times; that then two or three exchanges of passing signals of two blasts each were given, and that as they were about abreast the Florida saluted, which was returned. Owing to the fog, these vessels did not see each other, but from the sounds their distance apart is estimated at from one-half to one mile when abreast. The evidence from the deck of the Florida is that no change in her course was made. The evidence from the deck of the St. Paul is that she had been on a compass course of N. W. by N., and starboarded about two and one-half points when passing signals were exchanged with the Florida, and that she held this altered course until nearly abreast of the Florida, and then returned to her original course. The evidence from the deck of the Florida is that the blowing of fog signals was continued after passing the St. Paul, at intervals of one minute, and that after two or three such signals a signal of two blasts was heard about one point on her starboard bow, at an estimated distance of three-eighths of a mile ahead. This was immediately replied to by a like signal of two blasts, and her wheel put hard a-starboard. After the wheel had been thus put over, the Florida blew two whistles again, which was answered by two. About this time there came in sight the top of a spar, and then the pilot house of the Roby. Thereupon the captain of the Florida blew a long whistle to his engineer to put on all his steam, his theory being that his best chance to avoid collision was to get out of the way by crossing the probable course of the Roby as rapidly as possible. It is then claimed for the Florida that after this long engine whistle had ceased blowing there was heard from the steamer, which proved to be the Roby, a series of engine whistles, three to check, one to stop, two to back, and that these were followed by a long whistle, which was blown until the Roby struck her. The distance at which the spar was first seen is estimated at from seven to eight hundred feet, and the pilot house at about two lengths, or six hundred feet. The bow of the Roby struck the starboard side of the Florida at a right angle, about amidship, and penetrated a distance of from ten to twelve feet, making a wound about twenty-five feet wide, from which she sank in about fifteen minutes. The Florida witnesses say that when the bow of the Roby came in sight she was carrying a "big bone in her teeth" and going at a speed which they estimated at from eight to ten miles per hour. They also say that she was apparently not under a starboard helm, as she was not swinging in accordance with her passing signal. It is claimed for the Florida that she began to swing under her starboard wheel as soon as it was put over, and had swung so far as that her head was pointed N. E. by E. when struck, being a change of seven and three-quarters points to port from her course before starboarding.

From the witnesses from the Roby and her tow, the Becker, we get a story which in most points differs radically from that given by the officers and crew of the Florida. (1) The Roby was proceeding up the lake upon a course N. W. by N. ¼ N., a course substantially parallel with that claimed to have been the course of the Florida. This course, it is claimed, was not altered until changed by starboarding under a passing agreement supposed to have been made with the Florida just before the collision. (2) The Roby was passed by the St. Paul, bound up the lake upon a course substantially

parallel with and about one mile on the port side of the Roby. As the Roby and St. Paul were about abreast, there was a rift in the fog, and each vessel saw the other, and from this sight, as well as from signals and engine whistles, the distance between the two steamers is judged to have been closely in the neighborhood of one mile. (3) After the St. Paul had passed, the fog signals of a steamer "in the same direction as the St. Paul, but further up the lake," were heard. This turned out to be the Florida. They heard her blow a passing signal of two blasts to the St. Paul, which were answered by the latter. These signals were estimated by the master of the Roby as about three points off his port bow. For the Roby it is claimed that on hearing these passing signals her speed was checked down, and according to her engineer this checking down occurred just ten minutes before the collision. In respect to the speed of the Roby under this check, the evidence from her deck is that it was between four and five mile an hour. According to the testimony of her master, this speed was as low as consistent with the handling of the steamer. Her master says on this subject that he had some time before come to an understanding with his engineer that when he received a checking signal in a fog he should check down "as low" as his engine would "turn easily," and that the engineer said that she "would turn at about thirty turns and handle the engine nicely," and that this would give a speed of between four and five miles. The mate of the Roby was, however, of opinion that a speed of two miles would maintain steerageway. The engineer, though examined, did not testify upon the speed necessary to maintain her course. The captain of the Roby says that, "After checking we heard another exchange of passing signals." From the time the first fog whistle of the Florida was heard the only lookout on the Roby was the master himself, and this continued to be the case until the collision with the Florida. In addition to looking out, the master was navigating his boat and sounding engine signals. Ordinarily the Roby's fog whistle was operated by an automatic device, a Chase machine, but from the time of the Florida's passing agreement with the St. Paul the master blew the fog whistle by hand, by means of a brass lever with a wire, which he could reach from his place on top of the pilot house without moving. The fog whistles of the Roby were blown at regular intervals of one minute continuously from the time of hearing the Florida's fog whistle, as had been the case for some time prior thereto. The second or third set of passing signals between the St. Paul and Florida was followed by a salute from the Florida, answered by the St. Paul. The master of the Roby says he judged the salute from the vessel bound down the lake to be about three points off his port bow.

The master of the Roby then testified as follows: "A. After the salute was blown by the Florida and answered by the St. Paul, I heard the Florida blow three whistles, the fog signal, and I was blowing my regular fog signal then. I immediately blew one long passing signal, and the Florida again blew three fog whistles. I waited a reasonable length of time, and I blew one long passing signal again, and I didn't get any answer to that. I waited a reasonable length of time, and I didn't get any answer, and I blew the danger signal. I was about to stop my boat, had reached over to get hold of the lever to stop her, when I heard two whistles from the Florida. Q. Where was that? A. It wasn't over three points on our port bow. Q. And how far, in your best judgment, did it seem away? A. Well, I don't think it was less than half a mile. Q. Then what occurred? A. I answered her with two whistles, and stopped and backed my boat, ordered the wheel a-starboard before I blew my two whistles, and stopped and backed, and backed wide open. Q. Now, when you blew your danger signal, what was your idea in blowing or what was the situation to you? A. I could not get any answer from the Florida, and I thought I ought to have some understanding with her as to where she was going. Q. Now, you blew the danger signal, as you have stated, and how did the two-blast signal of the Florida after your danger signal, in point of time? A. Right immediately after. Q. What did the bearing of that signal and its distance, taking into account the bearing of the previous signals and their distance, indicate as to the

approach of that vessel? A. Well, it indicated that she was not heading on a parallel course with us. Q. Did it indicate anything about how she was bearing from that? A. Yes, sir; it indicated that she was heading out on a broadening course. Q. What did it indicate as to the position of the two vessels with relation to each other, if it indicated anything as to how she was making you? A. She must have been making us on the starboard side, or I would not have blown two whistles. Q. And taking the character of the whistle and starboard whistle with this indication from the direction of the different signals you had there, what was your conclusion at the time as to how the Florida was making you? A. Well, I supposed he was coming down and had us on his starboard bow, and intended to passing outside of us, and I thought he might as well pass outside as anything else. Q. Now, after you had replied with the two, and giving your reversing signals, was there any further signaling between the two boats? A. The Florida blew two whistles, and I again answered him with two. Q. In what kind of succession did those come in point of time? A. I replied immediately as quick as I heard it. It was a short time after he blew the first time. Q. And did you reply the second time? A. I replied immediately. Q. Now, captain, at that time you may state whether you did or did not have fear of collision with that boat. A. I had no fear of collision. Q. You may state when the circumstances there transpiring first indicated to you danger of collision. A. I didn't think there was any danger of collision until I seen him coming across our bow, about a length and a half away, probably, and then I didn't think we were going to do any damage. Q. Now, captain, when you first saw him, as you state, where was he from your vessel? A. About four points on our port bow, and probably two lengths away. Q. What was your boat doing at that time, when you first saw her, as you described? A. She was backing. Q. How was she backing? A. Wide open, full speed. Q. What personal knowledge had you of that? A. Well, I could see by the water that her way was stopping very fast, and she was shaking things up lively, rattling things up forward. Q. During the approach of the Florida how, if at all, was your vessel swinging? If she was swinging at all, which was it? A. She swung to port very slow. Q. Do you know anything of her heading? Can you tell us anything on the subject of her heading at the time of the collision? A. She was heading between N. W. and W. Q. How are you able to say that? A. I looked at the compass, and she was heading to the westward of N. W. Q. And did you take an accurate observation of the heading? A. I did not. Q. Now, the Florida, how did she come, and how did the vessels get in collision? A. Well, the Florida came across our bow. He was coming very fast, and he was swinging very fast. Q. What, if anything, indicated her speed to you? A. Well, she was throwing a white foam up in front of her, and I could tell she was coming fast by looking at her. She came on against us at a lively rate. Q. And during her approach what about your vessel's headway, and at the time of striking? A. Our headway was just about stopped when we came together."

The evidence from the deck of the St. Paul, so far as important, was in substance: That she passed up on port side of the Roby, the vessels when abreast being visible as a result of a rift in the fog, the Roby being apparently on a course about parallel, at a distance of from three-quarters to one mile. Heard Florida's fog signal when she was about two miles ahead, their bearing being "very near ahead, possibly on our starboard, not to exceed one-half a point." Also heard fog signals of Roby regularly up to and after passing Florida. When about one mile from Florida, passing signals of two blasts exchanged with Florida. Starboarded about two and one-half points after an agreement to pass starboard to starboard, and resumed course of N. W. by N., when nearly abreast of the Florida, which was her course before deflecting under passing agreement, as well as when the Roby was passed. A second, and perhaps third, set of passing signals of two blasts were next exchanged with the Florida, and as the boats were about abreast the Florida blew a salute of three long and one short whistle, which was returned with a like signal. Owing to the density of the fog, the Florida was not seen at all, but judged her to be about one-half mile outside; that

is, on starboard side of St. Paul. From fog whistles of Roby judged she was close on two miles behind when salute was blown. Speed of St. Paul on passing Roby and Florida about eleven and one-half miles.

Captain Jackson, of the St. Paul, says that after the salute the first thing that attracted his attention was that the boats approaching each other were "blowing together, both at the same time." The Roby was blowing one whistle and the Florida two. He states· that he heard the Roby blow a single blast signal twice, and that she then changed her whistle, and blew two blasts, "and her engine whistle, a back-up signal and one long whistle." He also says he heard the Roby blow a danger signal, and that this danger signal was "the last signal of the big whistles that I heard." Says the Florida's whistle was a big bass whistle, while the whistle of the Roby and St. Paul were nearly alike. Thinks the Florida was a mile down the lake behind him when he heard the cross signals. When he heard the first cross signal, remarked to his mate that there would be trouble, to which the mate agreed and noted the time. Crash of collision not heard on the St. Paul.

The mate and lookout of the St. Paul, in the main, agree that there were heard cross signals between the Roby and Florida. The mate says, after the salute between the Florida and St. Paul, he "heard the Roby blow one long whistle." The Florida answered with a regular fog signal of three blasts. "Then they got to blowing together, one was blowing one and the other two, and I heard the alarm and then the engine signals." This witness, as well as the lookout, thinks the alarm was the last big whistle heard from either of those boats.

The evidence from the deck of the schooner Becker, as might be expected, is in substantial accord with that from her towing steamer.

John C. Shaw, for Miller and others and the Florida.

Harvey D. Goulder, for the Roby.

F. H. Canfield, for British & Foreign Marine Ins. Co.

Before LURTON and SEVERENS, Circuit Judges, and WING, District Judge.

LURTON, Circuit Judge, having made the foregoing statement of the case, delivered the opinion of the court.

Upon an attentive examination of the whole of the evidence,— evidence which presents something more even than the usual conflict found in all such cases,—we have reached the conclusion that the court below did not err in finding both vessels at fault.

1. The Florida was clearly at fault in respect to her speed. Rule 15 of the "Act to regulate navigation on the Great Lakes and their connecting and tributary waters" (28 Stat. p. 645) is as follows:

"Every vessel shall, in thick weather, by reason of fog, mist, falling snow, heavy rainstorms, or other causes, go at moderate speed. A steam vessel hearing, apparently not more than four points from right ahead, the fog signal of another vessel, shall at once reduce her speed to bare steerageway, and navigate with caution until the vessels shall have passed each other."

It is not unlikely that while the Roby was blowing her two signals of one blast the Florida was blowing her fog whistle, and that the last fog signal blown by the Florida was mistaken by the Roby for a two-blast passing signal, and returned as such. This theory explains the blowing together testified to by the witnesses from the St. Paul, and partly explains why the Roby's single-blast signals, which we must believe were blown by her, were not heard on the Florida. But it is unnecessary to undertake to reconcile the

evidence in respect to the signals blown by the Roby. For the purposes of this case we may accept the account of the matter, given by the Florida witnesses, namely, that no signal, fog or passing, was heard on the Florida until the colliding vessels were within a little less than half a mile of each other, and that there was then heard a passing signal of two whistles, which seemed to come from nearly ahead. Upon the weight of evidence, the Florida's speed was at that moment not less than six miles per hour. Upon the seeming bearing of that single passing whistle, and without being able to see the approaching vessel, she changed her course by putting her wheel hard a-starboard, and kept her speed. In a moment the top of the spar of the Becker, in tow of the Roby, came in sight, and a second or so later the top of the Roby's wheelhouse was seen. In this situation she was put under full speed in the desperate hope that the seeming course of the Roby could be crossed before the latter could reach the point of intersection. The effort failed. The Roby's bow struck the Florida about amidship, cutting very deeply into her hull, and penetrating her cargo. Upon hearing the whistle of the Roby so near, and apparently right ahead, prudent navigation required that she should at once stop and reverse, until the location and course could be ascertained with certainty by either sound or sight. The City of New York, 147 U. S. 72, 84, 13 Sup. Ct. 211, 37 L. Ed. 84; The Umbria, 166 U. S. 404, 417, 17 Sup. Ct. 610, 41 L. Ed. 1053; The Fountain City, 10 C. C. A. 278, 62 Fed. 87, 22 U. S. App. 301, 309; The North Star, 10 C. C. A. 262, 62 Fed. 71, 22 U. S. App. 242. The fog was dense. The vessels appeared to be very near and to be drawing nearer. The only indication of the location and course of the Roby was the apparent bearing of a single passing whistle. Upon this uncertain basis for an opinion, the Florida maintained her speed and put her helm hard a-starboard. In the case of The New York, cited above, the court, in speaking of the duty of a steamer in a fog upon hearing the fog horn of an approaching vessel, said:

"Upon hearing the fog horn of the bark only one point on her starboard bow, the officer in charge should at once have checked her speed, and, if the sound indicated that the approaching vessel was near, should have stopped or reversed until the sound was definitely located or the vessels came in sight of each other. Indeed, upon the testimony in this case, it is open to doubt whether, if the engine had been at once stopped, the steamer would have come to a standstill before she had crossed the course of the bark. There is no such certainty of the exact position of a horn blown in a fog as will justify a steamer in speculating upon the probability of avoiding it by a change of the helm, without taking the additional precaution of stopping until its location is definitely ascertained." The Hypodame, 6 Wall. 216, 18 L. Ed. 794; The Kirby Hall, 8 Prob. Div. 71; The Sea Gull, 23 Wall. 165, 23 L. Ed. 90; The Ceto, 6 Asp. 479, 14 App. Cas. 670.

We think this is just as applicable to a fog whistle as to a fog horn, and as applicable to two steamers in a fog as to a steamer and sailing vessel. The observation of the court in that case was bottomed upon a line of English and American cases, many of which were discussed by Judge Taft in delivering the opinion of

this court in the North Star Case, cited above, and need not be again discussed.

In the case of the Umbria, cited above, Justice Brown, after an elaborate consideration of the English and American cases, reached the conclusion that:

"The general consensus of opinion in this country is to the effect that a steamer is bound to use only such precautions as will enable her to stop in time to avoid a collision, after the approaching vessel comes in sight, provided such approaching vessel is herself going at the moderate speed required by law. In a dense fog this might require both vessels to come to a standstill until the course of each was definitely ascertained. In a lighter fog it might authorize them to keep their engines in sufficient motion to preserve their steerageway."

Here the fog was dense, and the circumstances of the case admitted of no modification by reason of the light character of the fog. But it is said that the right of vessels on the Great Lakes to navigate in a fog has been regulated by the act of 1895, known as the "White Law," and that under the rules of navigation there prescribed vessels are no longer under any duty to stop and reverse, provided they have agreed upon how they shall pass each other. But rules 15, 23, 26, 27, and 28 of the act of 1895 must be read and construed together. Rule 15 requires, without regard to nearness, that, on hearing a fog signal of another vessel within four points of right ahead, speed shall be reduced at once to "bare steerageway." Rule 26 is intended to apply to the ordinary circumstance of a failure to come to an agreement as to passing before coming within a half mile of each other. In such case the duty to reduce speed, and to stop and reverse, if necessary, is imposed, regardless of fog conditions, when the vessels come within the distance named by the statute. But under rule 15 the duty of such reduction of speed is imposed when the bearing of a fog whistle is within four points of right ahead, without regard to the distance of the vessels apart. The reduction of speed required by the rule must also be accompanied by "cautious" navigation "until the vessels pass each other." By rule 27 it is required that in obeying and construing these rules "due regard shall be had to all dangers of navigation and collision," etc., and by the 28th rule it is declared that the rules shall not operate to exonerate any vessel from the consequences of any "neglect to carry lights or signals, or of any neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

What would be the "cautious" navigation required after a vessel had reduced her speed as required by rule 15, or what precautions should be taken by vessels approaching each other in a fog, would depend upon the special circumstances, and in the determination of any question arising out of the navigation of colliding vessels, where the regulations prescribed by congress do not expressly apply, resort must be had to the sailing usages and principles of navigation which are not superseded by the positive terms of the statute. These rules or sea laws defining the precautions required by

111 F.—39

good seamanship and cautious navigation are to be deduced from the decisions of courts of admiralty, and are not to be regarded as superseded, except in so far as they are inconsistent with the statutory regulations. The Sea Gull, 23 Wall. 165, 173, 23 L. Ed. 90. To our minds, there can be no doubt but that under a long line of well-settled decisions there was apparent risk of collision in proceeding even at a reduced speed, with no other knowledge of the location and precise course of the Roby than that afforded by the first passing signal heard on the Florida. Confessedly, the vessels were within a half mile of each other, and apparently the Roby was nearly right ahead. If both vessels were moving at the speed each claims for itself, the vessels would meet in three or four minutes. The density of the fog prevented any sight of either vessel from the other. To go ahead on the chance of safety from the change of course authorized by the passing agreement was to take a risk not justified by sound principles of navigation nor authorized by the positive rules of congressional legislation. Upon hearing the passing signal of the Roby so near ahead and so close at hand, the Florida should have stopped and come to a standstill until the location and course of the Roby could be definitely ascertained.

2. For the Roby it is very earnestly urged that she checked down about 10 minutes before the collision, on hearing the Florida exchange passing signals with the St. Paul, and that she ran under bare steerageway until about a minute and a half before the collision, when her engines were stopped and backed wide open, and that her headway was nearly gone when the collision occurred. It is insisted that the Roby's speed under check was between four and five miles, and that this speed was as low as was possible to maintain her steerageway. The fifteenth rule was plainly applicable to the situation of the Roby, and it devolves upon her to show that she reduced her speed as required by the statute. "Bare steerageway" means the lowest speed consistent with the maintenance of headway. We are not satisfied that a speed of 5 miles per hour was the lowest speed at which the Roby could maintain headway. The evidence of Captain Smith, the master of the Roby, that 30 revolutions of her engine per minute were necessary in order that her engine should be "handled easily," and that 30 revolutions gave a speed of from 4 to 5 miles, was based on what his engineer had said to him. Oddly enough, the engineer was not examined on this point. The evidence of Captain Smith, taken as a whole, leads to the impression that he took a distinction between speed which "easily" enabled his vessel to keep her course and gave the helmsman little "trouble" to keep her from falling away, and that low speed required by the emphatic words of the statute which might suffice to keep a vessel on her course, even if much shifting of the helm be necessary to keep her from falling away. The mate of the Roby recognized this difference, and was of opinion that two miles per hour would enable the maintenance of steerageway. Certain it is that the speed of the Roby was such as to render fruitless

all efforts to stop her, which were begun shortly before the vessels became visible to each other. The direction and force of the blow tend to corroborate the witnesses from the Florida that when she came in sight she showed a considerable "bone in her teeth." The estimate that her speed was then about ten miles per hour is doubtless much exaggerated, but we are convinced that her speed was considerable when she came within two lengths of the Florida, and that her headway had by no means been lost when the collision occurred. These conclusions lead to two results: First, that while running under check her speed was not as low as it should have been; and, second, seasonable efforts were not made to stop and back. We shall not attempt to reconcile the conflicting evidence in respect to the signals blown by the Roby. On her own account of the matter she blew two signals of one blast each, which were not returned. She then blew an alarm. Between each of these signals there was the usual interval. The silence of the Florida while these signals were being blown was only broken by a fog whistle blown after the first passing signal. Assuming that this alarm was blown as claimed, it is not improbable that it was mistaken on the Florida for a two-blast passing signal, and replied to as such. The helm of the Roby was then put hard a-starboard. A second two-blast was then heard. Thereupon the engine whistle was blown to stop, back, back strong, etc. Before her headway had been stopped, and before she had swung but little under her starboard helm, the collision occurred. The effort to stop and back was postponed too long. Captain Smith had every reason to fear he was running a risk of collision. He could not know the position or course of the Florida with any such certainty as to justify him keeping on after he failed to get a response to his first signal of one blast. He had judged that the first fog signals he heard from the Florida were three points off his port bow. This was when the Florida was about three miles up the lake. When this distance was reduced about one-half he judged her passing signals to the St. Paul to be still three points off his port bow. When she saluted the St. Paul when abreast he still judged her whistle to have the same bearing. The fog whistle which he heard after his first signal of one whistle was still judged by him to be three points off his port bow. That the Florida was approaching all the time he recognized. The fact that although she was approaching the bearing of her whistle did not broaden off his port bow was high evidence that if his original judgment of her bearing was correct the Florida was on a course which was drawing nearer and nearer to his own, and that in proceeding he was running a risk of collision. The North Star, 10 C. C. A. 262, 273, 62 Fed. 71.

"In practice, one of the most usual indications of risk of collision is that the approaching ship remains upon the same bearing from the observing ship for an appreciable length of time." Mars. Mar. Coll. (2d Ed.) 350.

The captain of the Roby, testifying as an expert, said, in speaking of the means of locating an unseen approaching vessel by sounds, "that after she approaches you she will broaden off if she

is on a parallel course." As she did not broaden off, he ought to have realized that she was on a course which was not parallel to his own, but a course which was drawing nearer and nearer his own. But if the benefit of a doubt be given in respect to the duty of coming to a standstill when the Florida's fog whistle was heard in reply to the first passing signal of one whistle, we have no doubt but that, when a second passing signal failed to elicit a reply, every effort should have been made to stop and come to a standstill until the Florida could be located. The sequel shows, as is most always true in such cases, that a difference of a few seconds would have saved a collision. Instead of stopping then, an alarm was blown, which was followed by two whistles in reply to what was supposed to be two whistles from the Florida. The duty of stopping and definitely locating the approaching vessel rested strongly upon the Roby under her own view of the facts, and we are agreed that for this fault, as well as for failing to reduce her speed to bare steerageway when she first checked down, she must be condemned. The Roby is also to be condemned for not maintaining a proper lookout. The lookout enrolled as such was engaged in scrubbing deck during the whole of the events which resulted in a collision. The captain and his wheelsman were the only men forward on the deck engaged in the navigation of the ship. The Roby was then traversing a peculiarly crowded pathway for lake commerce, in a dense fog. The situation was one which demanded the utmost vigilance and caution. The duty of having as a lookout one giving his undivided attention to the duties required of lookouts is not lessened by anything in the act of 1895. Captain Smith, standing on top of the pilot house, was upon this occasion engaged in directing the navigation of his vessel, blowing engine whistle signals to his engineer and blowing by hand his fog whistle. True, his engine and fog whistles were operated by means of cranks, which could be moved without changing his place on the pilot house. In addition to all these duties he was the sole lookout. It is a plain fault for the master of a vessel to also assume the duties of a sole lookout. Chamberlain v. Ward, 21 How. 548, 16 L. Ed. 211; The Ottawa, 3 Wall. 268, 18 L. Ed. 165; Mar. Coll. 496. In the situation of the Roby the necessity for the undivided vigilance and attention of a lookout was particularly urgent. The only defense made upon this point is that the Roby should not be condemned for the failure to maintain a lookout, if the presence of one would not have availed to prevent the collision. The Blue Jacket, 144 U. S. 371, 389, 12 Sup. Ct. 711, 36 L. Ed. 469; The Dexter, 23 Wall. 69, 23 L. Ed. 84; The Annie Lindsley, 104 U. S. 185, 26 L. Ed. 716. But the absence of the lookout from duty under the circumstances of this case was flagrant negligence, and the burden of showing that the collision could not have been guarded against by a lookout rests heavily upon the Roby. The Farragut, 10 Wall. 334, 19 L. Ed. 946; The Ariadne, 13 Wall. 479, 20 L. Ed. 542; Robinson v. Navigation Co., 20 C. C. A. 86, 73 Fed. 883; The Emma Kate Ross (D. C.) 41 Fed. 826, 828. For the Roby it is urged that no num-

ber of lookouts could have added anything to the information which Captain Smith had "as to the presence, course, and purpose of the Florida, or gathered any information to change the navigation of the Roby." We are not prepared to say that Captain Smith had all of the information a vigilant lookout could have given him touching the approach and course of the Florida, and especially touching the bearing of her whistle sounds. He does not pretend to have taken the exact bearings of the signal whistles he heard from the Florida. Possibly he could not, and possibly an attentive, watchful lookout in the eyes of the ship could not. But are we authorized to say that such a lookout might not have noticed that the bearing of the Florida was not so far off the port bow of the Roby as Captain Smith judged? The captain's judgment was that the bearing was about three points, while his wheelsman judged that the bearing of the same sounds was from one to two points off her port bow. Who was right? The men on the Florida judged that the bearing of the Roby was nearly right ahead, and not over a half point off their starboard bow. Which of these estimates was right? Estimates of the distance between the St. Paul and the Florida, when they passed each other, varied from one-half to one mile. The Florida was inside of the St. Paul, which had passed up about one mile inside the Roby and on a course about parallel with that of the Roby. The St. Paul and Florida passed each other under a starboard agreement. Did the Florida starboard in accordance with the agreement? If so, this must have drawn her nearer to the course of the Roby. The evidence from the deck of the Florida is that she did not starboard her wheel until she received a two-blast signal from the Roby. But the Roby people say that they gave no such signals until they received one of that character from the Florida. Was a fog signal from the Florida mistaken for a two-blast passing signal? If not, how does it happen that Captain Smith supposes he heard such a signal? Upon that assumption he starboarded his wheel. The disinterested witnesses from the St. Paul unite in saying that the Florida blew simultaneously with the Roby; the former blowing one blast, while the latter blew two. The Roby people say that they did blow two signals of one blast and got no response to either. Was this due to the fact that the Florida's whistle was not heard, or are the St. Paul witnesses wholly mistaken in saying that both boats blew together? For the purpose of determining the knowledge that each boat had of the signals heard from the other, and of determining what signals were blown on each boat, we have, in a former part of this opinion, assumed the truth of the story which comes from the deck of each boat as to signals given and heard. But can it be said that a watchful and attentive lookout might not have confirmed the testimony concerning the simultaneous blowing of cross signals before the Roby confessedly changed to a signal of two blasts? The course of the Florida before she changed her wheel to starboard, according to her wheelman, was S. E. ¾ S. At the time of the collision it was N. E. by E. This involved a change of

7¾ points. So remarkable a change has been the subject of much very sensible comment by counsel for the Roby, and it has been very plausibly argued that the course of the Florida was not correctly given by her wheelsman. If counsel are right in the argument that the change in the Florida's course under starboard wheel was not 7¾ points, but 4 and a fraction, it only results that the course of the Florida, before the exchange of signals of 2 blasts, must have been a course which was drawing nearer and nearer to the course of the Roby, and which would carry her across her bows. But Captain Smith made no discovery of this sort in the changed bearing of signals. Down to the last signal he heard, he judged the Florida to be 3 points off his port bow, and entertained no fear of a collision until the Florida came in sight. These considerations, and others which arise upon the very conflicting evidence of a very voluminous record, induce the feeling that it is not satisfactorily shown that Captain Smith had all the information which could have been derived from a lookout giving undivided attention to his duties.

3. It is next insisted that it was error to give to the owners of the Roby the benefit of the limited liability act (9 Stat. 635). The contention is that the Roby was insufficiently manned in respect to a lookout. By virtue of his office and the rules of maritime law, the master's duty was to select and station his crew. Butler v. Steamship Co., 130 U. S. 527, 554, 9 Sup. Ct. 612, 32 L. Ed. 1017. Among the crew were two watchmen, whose duty it was to serve as lookouts. It is in evidence that the master was accustomed to require from these watchmen certain other services in the daytime, and that on this occasion the watchman on duty as a lookout had been ordered aft to scrub deck. Under the circumstances existing, this was an act of grave negligence. But it was the duty of the master, and not that of the owners, to see that a competent lookout was always on duty. If the master chose to assign to the lookout a duty which took him from his station or divided his attention, how could the owners prevent it? A case might be made against the owners if it was shown that they were privy to such an act of negligence, or that they knew that the master was in the practice of keeping no lookout, or of requiring other duties inconsistent with the watchfulness and undivided vigilance constantly due from a lookout. No such case is made here. The owner is not to be deprived of the benefit of the limited liability act, afforded by the provisions of section 4283 of the Revised Statutes, for the misconduct of the officers or men of the vessel, to which he is not privy. Walker v. Transportation Co., 3 Wall. 150, 18 L. Ed. 172; Butler v. Steamship Co., 130 U. S. 527, 554, 9 Sup. Ct. 612, 32 L. Ed. 1017; The Longfellow, 45 C. C. A. 379, 104 Fed. 360.

4. We come now to the question of damages and their apportionment. Both vessels being at fault, the damages must be divided. The appraised value of the Roby was $59,300. The claims against her and allowed were as follows: (1) The value of the Florida's cargo, represented by the British & Foreign Insurance

Company, with interest to date of commissioner's report, August 28, 1899, $65,293.23; (2) the claims of the appellants Peter P. Miller and others, as trustees for cargo not represented by the British & Foreign Insurance Company, including interest to same date, $6,026.71; (3) the claims of same as trustee for the effects of officers and seamen of Florida, $1,462.79; (4) the claim of the same as owner of the Florida for one-half the value of that steamer, including interest to same date, less one-half the damage sustained by the Roby, $45,596.56. The owners of the Florida also preferred a claim for the loss of the unexpired term of the charter for the steamer for the season of 1897, a value reported by the commissioner as $13,889.52. This claim was disallowed. (a) The claim of the owners of the Florida to recover the value of the unexpired term of a season charter in addition to the full value of the lost vessel and her freight pending was properly rejected. The general rule is that, where the loss is total, the estimated profits of a charter not yet entered upon are always rejected. Where the loss is partial, the damages, for very apparent reasons, include all loss due to detention for repairs, which may include the profits of a charter not yet entered upon. In such case the question is as to the value of the use of the vessel while undergoing repairs. The distinction is elaborated and the authorities cited in the case of The Umbria, 166 U. S. 404, 421, 17 Sup. Ct. 610, 41 L. Ed. 1053, which case was followed by this court in the case of Mason v. Insurance Co. (decided at June session) 110 Fed. 452. The fact that the Florida was under a charter party for the season affords no reasonable room for a distinction. The compensation was payable in monthly installments. One installment had been earned and paid. Appellants were also permitted to recover for freight pending. The future installments were not earned nor entered upon, but as a compensation the owners were permitted to recover the full value as a substitute for the vessel and all her future earnings. (b) The fund applicable to pay all the damages consists in the appraised value of the Roby, the owners of the latter having availed themselves of the benefit of the limited liability act. That fund does not more than equal one-half of the total damages. If all of the claimants stood upon an equal footing, in consequence of their equal innocence or equal contribution to the cause of the disaster and loss, the fund should be distributed pro rata upon their several claims, as provided by the fifty-fifth rule in admiralty. Transportation Co. v. Wright, 13 Wall. 104, 122, 20 L. Ed. 585. In the case just cited it appeared that the steamer Norwich came into collision with the schooner Van Vleit, and that the schooner and her cargo were a total loss. The Norwich, which was solely at fault, availed herself of the benefit of the limited liability act. The Norwich herself sustained damage, and her cargo was lost. The owners of the schooner and her freight and the owners of the cargo on the Norwich, being equally innocent, were permitted to share pro rata in the fund which represented the value of the Norwich and her pending freight. Touching the claim of the libelants, the owners of the sunken schooner and her cargo, the court said:

"But the claim of the libelants alone is not alleged to be greater than the value of the steamer and her freight. The libelants, therefore, would be entitled to receive the whole amount of this damage, if they were the only persons who sustained damage, or if, by reason of the nature of their claim, their lien was superior to that of the owners of the cargo lost on the steamer. Liens for reparation for wrong done are superior to any prior liens for money borrowed, wages, pilotage, etc. But they stand on an equality with regard to each other if they arise from the same cause. We think, therefore, that the lien of the libelants for the loss of the schooner and her cargo, arising from the collision, is on an equality with the lien for the loss of the cargo of the steamer from the same cause. This being so, the case for the application of the statute arises; for it is alleged by the libelants that the damage to the schooner and her cargo, together with the damage arising from the loss of the steamer's cargo, greatly exceeds the value of the steamer and her freight for the voyage."

The fifty-fifth rule preserves "to all parties any priority to which they may be legally entitled." In consequence of the supposed innocence of the owners of cargo lost on the Florida, they were awarded by the court below priority of payment out of the fund to be paid in by the owners of the Roby. The ground upon which the cargo owners were preferred by Judge Swan, who heard this cause in the district court, is thus stated by him:

"It is recognized equity, however, that the claim of an injured party wholly innocent of fault or dereliction resulting in a loss should be more favorably regarded than that of a creditor against the same fund whose negligence aided to cause the loss. Such a case would present an exception to the general rule of pro rata division among sufferers by a common disaster, and that rule should be limited to cases where all the parties seeking reparation are equally innocent of fault, unless statutory or judicial authority has otherwise determined."

The soundness of this rule of distribution is not denied by the learned counsel representing the owners of the Florida as a general rule of equity, applicable in maritime cases prior to the enactment by the congress of the act of February 13, 1893 (27 Stat. 445) generally known as the "Harter Act." The contention is that the third section of the Harter act "places it beyond the power of the cargo to take the proceeds which would have gone to the hull interests had the Florida been without cargo." That section is in these words:

"Sec. 3. That if the owner of any vessel transporting merchandise or property to or from any port in the United States of America, shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped and supplied, neither the vessel, her owner or owners, agent, or charterers shall become or be responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel, nor shall be held liable for losses arising from dangers of the sea or other navigable waters, acts of God, or public enemies, or the inherent defect, quality or vice of the thing carried, or from insufficiency of package, or seizure under legal process, or for loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative or from saving or attempting to save life or property at sea, or from any deviation in rendering such service."

The argument of counsel against any preference to the cargo interests is: That "if the Florida had been without cargo, her owners would receive their full half damage under the decree dividing

damages as entered in the district court.    *    *    *    Being with cargo, if such cargo is given priority, and absorbs what would otherwise have gone to the hull, then, by such priority, the owners of the Florida shall become or be responsible for damages or loss resulting from fault or errors in navigation, or in the management of said vessel, in direct derogation of the statute." In short, the contention is that the well-settled equitable rule which prefers an entirely innocent claimant upon a fund over another whose fault contributed to the common loss shall be set aside, because its operation will be to prevent a realization of the decree in favor of the Florida against the Roby. The equitable preference accorded the superior equity of the cargo owner in the fund from which all losses must be paid is wrongfully described as an indirect imposition of cargo liability contrary to the statutory exoneration intended. The trouble lies further back. But for the limited liability act, there would have been no occasion to call into operation the rule for distribution of a common fund insufficient to pay all. The question to be decided comes to this: Is the third section of the Harter act to be construed as operating to restrict the operation of general and well-settled principles of law beyond the plain and explicit relief afforded from their operation by the words of the statute? The Harter act has several times been under consideration by the supreme court. In the case of The Delaware, 161 U. S. 459, 471, 474, 16 Sup. Ct. 516, 40 L. Ed. 771, it was sought to have the act construed as exonerating a vessel and its owners from all liability for a collision resulting from the fault and mismanagement of those responsible for her navigation. This view of the act was rejected, the court, among other things, saying that "the whole object of the act is to modify the relations previously existing between the vessel and her cargo," and that its "provisions have no possible application to the relation of one vessel to another." In the case of The Irrawaddy, 171 U. S. 187, 18 Sup. Ct. 831, 43 L. Ed. 130, there was involved the question whether the owner of a seaworthy vessel, stranded through the negligence of her master, was entitled to a contribution in general average for sacrifices made and suffered in unsuccessful efforts to save the vessel and her cargo by reason of the exoneration of the vessel from liability to her cargo for the negligence of his master and crew. It was conceded that prior to the Harter act no such claim was admissible, if the stranding was due to faults of navigation. The contention was that as the Harter act had relieved the vessel and her owners from liability to the cargo owners when the loss was due to negligent navigation, that a right to contribution now existed notwithstanding the negligence of the master was the cause of the stranding. The court, in its opinion, said:

"We are unable to accept this view of the operation of the act of congress. Plainly, the main purposes of the act were to relieve the shipowner from liability for latent defects, not discoverable by the utmost care and diligence, and, in event that he has exercised due diligence to make his vessel seaworthy, to exempt him and the ship from responsibility for damage or loss resulting from faults or errors in navigation or in the management of the

vessel. But can we go further, and say that it was the intention of the act to allow the owner to share in the benefits of a general average contribution to meet losses occasioned by faults in the navigation and management of the ship? Doubtless, as the law stood before the passage of the act, the owner could not contract against his liability and that of his vessel for loss occasioned by negligence or fault in the officers and crew, because such a contract was held by the federal courts to be contrary to public policy, and, in this particular, the owners of American vessels were at a disadvantage as compared with the owners of foreign vessels, who can contract with shippers against any liability for negligence or fault on the part of the officers and crew. The inequality, of course, operated unfavorably on the American ship owner, and congress thought fit to remove the disadvantage, not by declaring that it should be competent for the owners of vessels to exempt themselves from liability for the faults of the master and crew by stipulations to that effect contained in bills of lading, but by enacting that, if the owners exercised due diligence in making their ships seaworthy, and in duly manning and equipping them, there should be no liability for the navigation and management of the ships, however faulty. Although the foundation of the rule that forbade shipowners to contract for exemption from liability for negligence in their agents and employés was in the decisions of the courts that such contracts were against public policy, it was nevertheless competent for congress to make a change in the standard of duty, and it is plainly the duty of the courts to conform in their decision to the policy so declared. But we think that for the courts to declare, as a consequence of this legislation, that the shipowner is not only relieved from liability for the negligence of his servants, but is entitled to share in a general average rendered necessary by that negligence, would be in the nature of a legislative act. The act in question does, undoubtedly, modify the public policy as previously declared by the courts, but, if congress had intended to grant the further privilege now contended for, it would have expressed such an intention in unmistakable terms. It is one thing to exonerate the ship and its owners from liability for the negligence of those who manage the vessel; it is another thing to authorize the shipowner to do what he could not do before, namely, share in the general average occasioned by the mismanagement of the master and crew."

In the case of The Chattahoochee, decided by the circuit court of appeals for the First circuit, and reported in 21 C. C. A. 162, 33 U. S. App. 510, 74 Fed. 899, the facts were that the steamer Chattahoochee collided with the schooner Golden Rule. The owners of the schooner filed their libel in the district court in their own behalf and in behalf of the officers and crew, and as bailees of her cargo, against the steamship Chattahoochee, to recover for the loss of the schooner and her cargo, and the personal effects of the master and crew, through the collision. The district court held both vessels at fault, and gave the libelants a decree for one-half the value of the vessel and the full value of the cargo, "with the usual right to recoup." From this decree the libelants alone appealed. Judge Putnam, for the court, thus states one of the issues raised by the appeal:

"Both vessels being in fault, the district court, on the well-settled rule, allowed the steamer, which was not damaged, to recoup against one-half of the value of the schooner and one-half of the value of the cargo, still leaving a net balance for which a decree was made in favor of the schooner, her officers and crew, after fully satisfying and paying the loss to the cargo owners. In this way the schooner indirectly suffers the loss of one-half of the value of the cargo, though it was by a diminution of the damages awarded her."

She claims that this was in violation of section 3 of the act of February 13, 1893 (27 Stat. 445, c. 105), commonly called the "Harter Act." The court held, following the case of The Delaware, 161 U. S. 459, 16 Sup. Ct. 516, 40 L. Ed. 771, that the Harter act has no relation to the claim for the loss of the schooner herself, and furthermore said:

"The general purview of the statute limits it to the relations between a vessel and her owners and the cargo aboard and its owners, and merely gives a statutory bill of lading, as was said partly in terms and partly in effect in The Delaware. It has no proper relation to claims between colliding vessels or to the rusticum judicium of the admiralty, which established the rule by which such claims are divided in case of mutual fault; or, consequently, to the qualification of that rule by means of which the net damages are diminished by recoupment. The liability to which the statute appertains is that arising from a bill of lading, or other contract of carriage; while that with which we are dealing comes from the relations of colliding vessels to each other, and is precisely the same as though the cargo lost had been the lading of a third vessel, involved in the collision, but in no way at fault."

The court further held that the rule stated and applied in The North Star, 106 U. S. 17, 1 Sup. Ct. 41, 27 L. Ed. 91, was not affected by the Harter act, that rule being that "in cases of collision occurring by the fault of both parties the entire damage to both ships is added together in one common mass, and equally divided between them, and thereupon arises a liability of one party to pay to the other such sum as is necesssary to equalize the burden." The decree of the district court was affirmed in so far as the Chattahoochee had been allowed to set off the decree against her for one-half the value of the schooner by one-half of the decree for cargo damages. This case was taken to the supreme court on writ of certiorari, where the decree of the court of appeals was affirmed, the opinion being by Mr. Justice Brown, and reported in 173 U. S. 540, 552, 19 Sup. Ct. 491, 43 L. Ed. 801. The argument in behalf of the owners of the sunken schooner against the right of the Chattahoochee to set off her liability for one-half the value of the schooner by one-half the decree against her for cargo damages was precisely the argument now made to avoid the application of the rule of priority which gives preference to the claims of innocent cargo owners over 'the claims of the vessel owners whose vessel had contributed to the collision. Thus (at page 552, 173 U. S., pages 495, 496, 19 Sup. Ct., and page 807, 43 L. Ed.) Justice Brown states that the contention was that—

"The exemptions of the Harter act are not intended for the benefit of the steamship or any other vessel by whose negligence a collision has occurred, but for the benefit of the carrying vessel alone; and, if she be held liable in this indirect manner for a moiety of the damages suffered by the cargo, the act is to that extent disregarded and nullified. That the amount which is paid by recoupment from the just claim of the schooner against the steamship is paid as effectually as it would be by a direct action by the owners of the cargo against the schooner."

This the court answered by saying:

"But if the doctrine of the North Star be a sound one, that in cases of mutual fault the owner of a vessel which has been totally lost by collision

is not entitled to the benefit of an act limiting his liability to the other vessel until after the balance of damage has been struck, it would seem to follow that the sunken vessel is not entitled to the benefit of any statute tending to lessen its liability to the other vessel, or to an increase of the burden of such other vessel, until the amount of such liability has been fixed upon the principle of an equal division of damages. This is in effect extending the doctrine of the Delaware Case, wherein the question of liability for the loss of the cargo was not in issue, to one where the vessel suffering the greater injury is also the carrier of a cargo. In other words, if the Harter act was not intended to increase the liability of one vessel towards the other in a collision case, the relations of the two colliding vessels to each other remain unaffected by this act, notwithstanding one or both of such vessels be laden with a cargo. We are therefore of opinion that the court of appeals did not err in deducting half the value of the cargo from half the value of the sunken schooner, and in limiting a recovery to the difference between these values. The decree is affirmed."

It may be conceded that the precise question here presented did not arise in the case of The Chattahoochee, nor in any other case to which we have been referred. The opinion and decree in the Chattahoochee Case would, however, require that the Roby should have the right to set off against the decree in favor of the Florida for one-half the value of that vessel and her freight one-half of the decree against the Roby for cargo losses, and that the decree in favor of the owners of the Florida, in their own right, against the Roby, should be for the difference between the two sums only. If that were done, the matter would stand thus:

Amount of the decree against the Roby in favor of the British & Foreign Insurance Co., underwriters on cargo.................... $65,295 33
Amount of decree in favor of the owners of the Florida as bailees for cargo unrepresented by the intervening underwriters...... 6,026 71

Total of decree for cargo damages against the Roby...... $71,322 04

Amount of the decree against Roby for one-half value of the Florida ............................................................ $45,596 56
Amount of decree for one-half value of effects of crew of Florida   1,462 79

$47,059 35
Deduct one-half of the decree against the Roby for cargo damages   35,661 02

Net decree in favor of the Florida....................... $11,398 33

But the appraised value of the Roby is less than the decree for cargo damages, and this at once raises the question as to whether the claims must be paid pro rata or the cargo claim before the net amount due to the Florida. From the interpretation placed upon the Harter act in the cases we have cited we deduce the conclusion that that act is not to be construed as affecting the operation of the equitable rule which postpones the claims of one whose fault contributed to the common loss as against the claims of innocent cargo owners. In the case of The Irrawaddy, already cited, Mr. Justice Shiras, in announcing the opinion of the court touching the meaning and effect of the Harter act, said:

"Upon the whole, we think that in determining the effect of this statute in restricting the operation of general and well-settled principles our proper

course is to treat those principles as still existing, and to limit the relief from their operation afforded by the statute to that called for by the language itself of the statute."

5. For the owners of the Florida it is next urged that, aside from the effect of the Harter act in exonerating the Florida from cargo liability, her bills of lading contain stipulations exempting her from liability for cargo lost as a result of collision, and that certain of her bills of lading also provide that any carrier by water, "liable on account of loss or damage," on account of the property shipped thereunder, "shall have full benefit of any insurance that may have been effected upon or on account of said property." Neither one of these stipulations has any bearing upon any question here presented. Neither cargo owners nor cargo underwriters are endeavoring to hold the Florida liable for cargo losses. The right of recoupment, which we hold to exist in favor of the Roby, by which one-half of the decree against her for cargo lost on the Florida has been set off against the decree against the Roby for one-half the value of the Florida, does not depend upon the liability of the Florida for cargo damages, but rests upon the liability of the two colliding vessels to bear equally the burden resulting from a collision due to their mutual fault. In other words the right of recoupment does not depend upon the relation of the carrying vessel to her cargo, but upon the relation of the colliding vessels to each other. Neither does the postponement of the balance due to the owners of the Florida, after recoupment, rest upon the liability of the Florida to cargo owners, but upon the general equitable principle that where the fund out of which the losses are to be paid is insufficient to pay the demands of all of the claimants, the claim of an innocent cargo owner shall be preferred over the claim of one whose fault contributed to the common disaster. In the last analysis the decree in favor of the Florida owners is ineffective, because, under the limited liability act, the fund for the payment of the Roby liabilities is not sufficient to pay both classes of claims. To say that the preference given to the cargo liability operates indirectly to make the Florida liable to cargo owners, contrary to the terms of the Harter act, and to deprive her of the benefit of her bill of lading stipulations for exemption from liability for cargo lost by a collision, as well as from the benefit of insurance taken on cargo by shippers, is to say no more than was said by the hull interests in the Cases of the Irrawaddy and Chattahoochee, already cited. The answer to the objection now under consideration is that the Florida has not been held liable to cargo owners, and, therefore, the bill of lading stipulations have not come into effect.

6. One other question remains for decision. The district court disallowed interest upon the bond given for the release of the Roby. The Roby was appraised at $59,300, and a bond with security executed for that amount, by which the owners of the Roby and their surety bound themselves, "in the sum of $59,300, unto whom it may concern, that the said Lakeland Transportation Company shall abide and answer the decree of the court in said matter, and shall

pay into the registry of the court said $59,300, and the interest on the same, as provided by law, the appraisal value of the said steamer, whenever such payment shall be ordered and required by the court." The district court had undoubted authority to require that the owners of the Roby, as a condition of the release of their vessel, should enter into a stipulation to pay the appraised value, either with or without interest, when ordered. The authority for the release of a libeled vessel, or for a vessel surrendered upon an application for the benefit of the limited liability act, is found in the fifty-fourth admiralty rule. Under that rule the owners of a vessel seeking the benefit of the limited liability statute might convey their vessel to a trustee to be named by the court, or the court might appraise the vessel and require the value to be paid at once into court, or release the vessel upon a stipulation to pay the appraised value into court when ordered. If the appraised value had been at once paid into court the fund might have been made productive by lending it out at interest or by investing in approved bonds. In such case the fund for ultimate distribution would have been enlarged. As such a course was open to the court it is clear that it might, as a condition of release upon bond, require that the stipulators' bond should bear interest from date. The Wanata, 95 U. S. 600, 24 L. Ed. 461; In re Harris, 6 C. C. A. 320, 57 Fed. 243. In The Favorite (D. C.) 12 Fed. 213, Judge Blodgett held that the owners might, irrespective of any prior order or stipulation, be required to pay interest upon the value of the vessel from the date of collision, the decree going against the owners and their surety in the stipulation for the value only, there being no provision binding the surety to pay interest before default. Where the stipulators defend the suit it is not unusual to charge them with interest from the date of the filing of the bond, upon the ground that they are responsible for the delays incident to the defense made. The Maggie M. (D. C.) 33 Fed. 591; The Wanata, 95 U. S. 612, 24 L. Ed. 461; The Maggie J. Smith, 123 U. S. 356, 8 Sup. Ct. 159, 31 L. Ed. 175. The question here arises upon the bond actually given and the liability of the makers of the bond. The liability of stipulators in a bond is limited to the amount therein named, and, if the stipulation does not bear interest, they are only bound for interest in case they make default in paying according to the terms of the obligation. The Wanata, 95 U. S. 600, 24 L. Ed. 461. Here the stipulation is that they shall pay "said $59,300, and the interest on the same, as provided by law." Do the words, "and the interest on the same, as provided by law," imply an agreement to pay interest from the date of the obligation? The words used in the obligation must determine the rights of the parties. What did the stipulators mean by agreeing to pay the principal sum "and the interest on the same, as provided by law," if they did not mean to pay interest at the rate provided by law for like contracts from the date of the agreement? By the execution of this obligation the owners obtained the use of their vessel. Their liability was for the value of the vessel at the time of the collision. Why shall they be allowed the use of that value during a protracted

litigation carried on by themselves? The justice of the matter was that the value at date of collision should be made productive. An agreement to pay that value "and the interest on the same, as provided by law," can have no reasonable meaning attached to it unless it implies an agreement to pay interest, at the rate provided by law, upon the principal sum from the date of the agreement. It may be that the words used are somewhat ambiguous. But any ambiguity in such an obligation is to be construed against the makers of the instrument. 2 Pars. Notes & B. 392; Brandt, Sur. (2d Ed.) § 92. Unless these words are construed as an agreement to pay the legal rate of interest from the date of its execution, the language is idle, for without them the stipulators would be liable for interest from the time of its maturity, which would be the time when the court should order payment. We think the district court erred in not ordering the payment of interest at the rate allowed by the law of Michigan from the date of this obligation. In this respect the decree of the court below must be modified. In other respects the decree is substantially affirmed. Peter P. Miller and others will pay one-half of all the costs, and the Lakeland Transportation Company will pay the remainder.